## LUCAS v. UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
WESTERN DISTRICT OF ARKANSAS.

No. 692.  Submitted November 19, 1895. — Decided May 25, 1896.

On the trial of a Choctaw Indian for the murder of a negro at the Choctaw
Nation, in the Indian country, the status of the deceased is a question of
fact, to be determined by the evidence, and the burden of proof is on the
Government to sustain the jurisdiction of the court by evidence.

Statements alleged to have been made by the negro in his life time that he
did not belong to the Indian country are not admissible for that purpose.

DEFENDANT was indicted in the Circuit Court of the United
States for the Western District of Arkansas, February 15,
1895, for the murder, at the Choctaw Nation, in the Indian
country, of one Levy Kemp, who was alleged in the indict-
ment to have been "a negro and not an Indian." Having
been tried and convicted, he was sentenced to death. He
then sued out a writ of error from this court.

It was proven at the trial that defendant was a Choctaw
Indian, and that Kemp was by blood a negro. The crime was
alleged to have been committed in the fall of 1894.

The Indian tribes residing within the territorial limits of the
United States are subject to their authority, and where the
country occupied by them is not within the limits of any one
of the States, Congress may, by law, punish any offence there
committed. See *In re Mayfield*, 141 U. S. 106, 112, and
cases there cited. By section 8 of article VIII of the treaty
between the Choctaw and Chickasaw Indians, concluded April
28, 1866, 14 Stat. 769, 773, it was agreed by those Indians that
a court or courts might be established in the Indian Territory
with such jurisdiction and organization as Congress might pre-
scribe, provided that the same should not interfere with the
local judiciary of said nations.

The jurisdiction of the Circuit Court of the United States
for the Western District of Arkansas was made to extend, by
section 533, Revised Statutes, to "the country lying west of
Missouri and Arkansas, known as the 'Indian Territory.'"

Subsequently, by the act of Congress of January 6, 1883, 22 Stat. 400, c. 13, § 2, and the act of March 1, 1889, 25 Stat. 783, 786, c. 333, § 17, certain parts of the Territory were annexed, respectively, to the District of Kansas and the Eastern District of Texas, leaving that part of the Territory which includes the portion of the Choctaw Nation in which this case arose, to remain within the Western District of Arkansas.

Section 2145, Rev. Stat., provides that, except as regards certain crimes, " the general laws of the United States as to the punishment of crimes committed within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country;" and by section 2146, Rev. Stat., it is provided that " the preceding section shall not be construed to extend to crimes committed by one Indian against the person or property of another Indian."

And by the act of May 2, 1890, c. 182, 26 Stat. 81, " to provide a temporary government for the Territory of Oklahoma, to enlarge the jurisdiction of the United States court in the Indian Territory, and for other purposes," it is provided " that the judicial tribunals of the Indian nations shall retain exclusive jurisdiction in all civil and criminal cases arising in the country in which members of the nation by nativity or by adoption shall be the only parties," etc.

By the third article of the above mentioned treaty with the Choctaws and Chickasaws they, in consideration of the sum of $300,000, ceded to the United States certain territory, with the provision that the said sum should be invested and held in trust for the said nations by the United States, at interest, until the legislatures of the Choctaw and Chickasaw nations, respectively, should have made such laws, rules and regulations as might be necessary to give all persons of African descent, resident in the said nations at the date of the treaty of Fort Smith, and their descendants, held in slavery among the said nations previously to the date of the treaty, all the rights, privileges and immunities, including the right of suffrage, of citizens of said nations, etc.   The second article provided that slavery in the said two nations should be at once abolished.

Previously to the year 1879, the Choctaw Nation had mani-

fested a willingness to adopt its freedmen, but the question seems to have arisen whether the joint or concurrent action of both nations was not required to make the adoption by either nation valid. It is understood that the Chickasaws, for some reason, refused to agree to any plan of adoption into their nation of the freedmen belonging therein; and that, therefore, the Choctaw National Council, on November 2, 1880, sent a memorial to Congress expressing their willingness to accept their freedmen as citizens, and asking for legislation that would enable them to do so. The only result of this memorial seems to have been the introduction of a Senate bill which was never reported. Two years later, however, in 1882, a clause was inserted in the Indian appropriation bill, act of May 17, c. 163, of that year, 22 Stat. 68, 72, providing for the appropriation of the sum of $10,000 out of the $300,000 reserved by the third article of the treaty above referred to, for the purpose of educating freedmen of the Choctaw and Chickasaw Nations, to be expended in the manner directed by the act, and providing further that either of said nations might, before the expenditure of the money so appropriated, adopt and provide for the freedmen of the said nations, respectively, and that in such case its proportion of the money appropriated should be paid over to such nation. Under this provision the Choctaw Nation adopted its freedmen as citizens by an act of its legislature of May 21, 1883. This action of the Choctaw Nation is referred to in the Indian appropriation act of March 3, 1885, 23 Stat. 362, 366.

*The plaintiff in error* submitted on the record.

*Mr. Assistant Attorney General Dickinson* for defendants in error.

MR. JUSTICE SHIRAS delivered the opinion of the court.

It has recently been decided by this court in the case of *Alberty* v. *United States,* 162 U. S. 499, that the act of May 2, 1890, wherein it provides that the judicial tribunals of the Indian nations shall retain exclusive jurisdiction in all civil

and criminal cases arising in the country in which members of the nation by nativity or by adoption shall be the only parties, is to be construed as meaning the parties to a crime as well as parties to a civil controversy, and as, under the present condition of the laws pertaining to the Choctaw tribe, negroes who have been adopted into the tribe are within the jurisdiction of its judicial tribunals, it follows that the averment in the indictment in the present case that Levy Kemp, the murdered man, was a negro and not an Indian was the averment of a jurisdictional fact, which it was necessary for the prosecution to sustain by competent evidence. Such averment implied that there were negroes who were and those who were not Indians in a jurisdictional sense.

As the accused was a Choctaw Indian, as the killing took place in the Indian Territory, and as Kemp was alleged and conceded to be a negro, the question arises, what was the legal presumption as to the latter's citizenship? Is it to be presumed that he was a citizen of the United States, or that he was a member and citizen of the Choctaw tribe?

We understand the learned judge to have assumed that the presumption was that Kemp was not a member of the Choctaw tribe, and to have so instructed the jury. His language on this subject was as follows:

"In the first place, you are required to find that Kemp, the man killed, or the unknown man, if you should believe his name has not been established, was a negro and not an Indian. That means he was a citizen of the United States; that means that the court has jurisdiction of the case under the law. You may find that proposition by circumstances as well as by what is called positive proof."

In disposing of the motion for a new trial, the judge said :

"Now it may be said that there are some people who are negroes who are adopted into that nation, but that is the exception to the rule. That is an exception to the general rule. The proof in this case, as we find by proceeding further on, shows that the deceased in this case, was not one of that class. It is certainly a correct rule of law when you come to an exception of that character, when you find a man who is a

negro by blood said to be such, and there was no controversy over that, and the government proves that fact, that makes a· *prima facie* case of jurisdiction, because it shows that he belonged to a race that, as a rule, are not of the Indian race, and they are only of such Indian race by adoption. When that fact is proven it makes a *prima facie* case of jurisdiction."

The view of the trial judge, therefore, seems to have been that a finding of the fact that the deceased was a negro established the jurisdiction of the court by reason of a presumption that a negro, though found within the Indian Territory, was not a.member of the tribe.

In so holding we think the court erred. If there is any presumption in such a case, it rather is that a negro found within the Indian Territory, associating with the Indians, is a member of the tribe by adoption. But we prefer, in the present case, not to invoke such a presumption, but to regard the status of the deceased as a question of fact, to be determined by the evidence. This was the theory of the indictment, as the allegation concerning Kemp's citizenship was not restricted to his being a negro, but added the averment, "not an Indian."

So, too, it is obvious that the attorney for the government did not rely upon a presumption that a negro, found in the Indian country, was not a member of the tribe, but undertook to sustain the jurisdictional averment of the indictment by affirmative evidence. John le Flore was called by the Government to prove that Kemp was not a resident of the Indian country, but had come from a place named Mount Kemp, near Little Rock, Arkansas. It is scarcely necessary to observe that, in the case of *United States* v. *Rogers*, 4 How. 567, where it was held that Rogers, a white man, was indictable in the Circuit Court of the United States for an offence committed in the Indian Territory, although he had become a member of the Cherokee tribe, there was no statute in terms extending jurisdiction of the Indian courts in civil and criminal cases over their adopted citizens.

Assuming that the government adduced competent evidence tending to show that Kemp was not a member of the tribe, still the admission of such evidence would not cure the error

of the instruction as to the presumption. The burden of proof was on the government to sustain the jurisdiction of the court by evidence as to the status of the deceased, and the question should have gone to the jury as one of fact and not of presumption.

But we are of opinion that the evidence put in by the government, on this question, was not competent. It consisted of statements alleged to have been made by the deceased, in his lifetime, to le Flore, the witness, that he did not belong to the Indian country, but had come from Arkansas. Such statements do not come within any rule permitting hearsay evidence. The trial judge appears to have regarded the testimony as within the rule that declarations of deceased persons made against their interest are admissible — that as a colored man adopted in the Choctaw Nation gets benefits, rights and privileges, a declaration made by him against that interest would be competent. It may be that, in a controversy on behalf of a deceased negro's right, or that of his representatives, to participate in the property of the nation, such admissions might be competent. But this case is not within any such rule. The object of the evidence here was not to enforce any rights or claims of the deceased against the Choctaw Nation, but was to sustain an allegation in an indictment, upon which the jurisdiction of the United States court depended.

It is contended in this court, on behalf of the government, that exception to this evidence was not sufficiently taken. The record, however, discloses that the counsel for the defendant, at the trial, objected to the questions put to the witness le Flore to elicit the statements made by Kemp. It is true that the question had been put and answered before the objection was made, but the defendant's counsel asked that the testimony should be excluded, and that an objection should be noted, and thereupon the judge declared the evidence competent. It is, therefore, apparent that the objection was made in time to enable the government to introduce other and more competent evidence, and that the judge did not overrule the objection because it was not taken in time, but because he

deemed the evidence competent.   Moreover, in the charge, the judge instructed the jury that they had a right to take into consideration the facts that had gone to them for the purpose of showing who Kemp was and where he came from, and as there was no other evidence on this topic than that of le Flore, it is plain that the judge submitted to the jury the evidence of le Flore, as to the statements, as competent.   To this portion of the charge the defendant excepted before the jury retired and in their presence.   It is, indeed, now contended that the exception was too indefinite; but we think that the exception was sufficient to enable the trial court to perceive the particular matter objected to.

We think, therefore, that the court erred in instructing the jury that they had a right to find that the deceased was not a member of the Choctaw Nation from the mere fact that he was a negro, and also in admitting evidence of the statements of the deceased and in instructing the jury that such statements were competent evidence as to his citizenship.

*The judgment is reversed, and the case remanded with instructions to set aside the verdict and grant a new trial.*