UNITED STATES of America,
Plaintiff-Appellee,

v.

Ramon TORRES and Tony Fish,
Defendants-Appellants.

Nos. 83–1083, 83–1096.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 9, 1983.

Decided May 1, 1984.

Rehearing and Rehearing In Banc
Denied May 25, 1984.

Kenneth N. Flaxman, William T. Huyck, Chicago, Ill., for defendants-appellants.

R. Jeffrey Wagner, Asst. U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, and BAUER and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

Appellants, Tony Fish and Ramon Torres, appeal their convictions for second degree murder in violation of 18 U.S.C. §§ 1111, 1153 (1982), conspiracy to commit murder in violation of 18 U.S.C. §§ 1117, 1152 (1982), and kidnaping in violation of 18 U.S.C. §§ 1201, 1153 (1982). We affirm.

I

The record reveals that on the afternoon of July 29, 1982, Daniel Rothering met appellant Ramon Torres, and his sister, Anita Torres, in Reedsville, Wisconsin. Rothering, at that time, sold a quantity of "pot" and "fronted ... a hundred hits of acid" to Ramon Torres. In return, Torres invited Rothering to attend the Blue Grass music festival being held in Mole Lake, Wisconsin, the following day. Rothering accepted the invitation and accompanied Torres and his sister to the Menominee Indian Reservation where they visited appellant, Tony Fish, and his wife, Theresa Fish. Following a visit where everyone "just sat around," Torres, his sister Anita, and Rothering left Fish's house and proceeded to a local gas station where they purchased a quantity of beer. Torres then returned to pick up Fish and his wife, Theresa, and the group of five drove to Diane Thunder's house, located on the Menominee Indian Reservation in Keshena, Wisconsin. When they arrived at Thunder's house, the group was joined by Ricky Fisher (a/k/a Ricky Katchenago) and Laurie Penass, who was visiting Thunder at the time. While at Thunder's house, members of the group consumed beer, "snorted" crystal methamphetamine (a controlled substance), and smoked sinsemilla, a refined grade of marijuana. The entire group eventually settled in the front room of Thunder's house, and at that time Ramon Torres displayed to members of the group, a knife that he had recently purchased.

At approximately 1:00 a.m. on the morning of July 30, 1982, the group of seven (consisting of Torres, his sister Anita, Fish, his wife Theresa, Rothering, Fisher, and Penass) left Thunder's house, loaded into Torres' Camaro, and proceeded to Martin's Lodge, a local tavern in Keshena, Wisconsin. The group purchased a case of beer and remained in the tavern's parking lot consuming the alcohol. At approximately 1:30 a.m., Officer Miller of the Menominee Tribal Police Force responded to a complaint that loud noises were emanating from the parking lot of Martin's Lodge. When Officer Miller arrived at the tavern, he observed appellants Fish and Torres along with five other individuals, standing around Torres' Camaro. Officer Miller instructed the group to leave the parking lot or go inside the tavern. The group purchased "some more beer," piled into

Torres' car, and drove five or six miles to a wayside rest area located on Highway 47 in Shawno County, bordering the Menominee Indian Reservation. After arriving at the wayside and consuming more beer, members of the group vandalized the premises by breaking the handle off a water pump and tipping over a metal housing that covered the water well.

Following these acts of vandalism, an automobile traveling along Highway 47 pulled off the roadway and into the wayside. The appellants, Fish and Torres, approached the vehicle and observed that the driver was alone at the time. As Fish began to speak with the driver, Torres returned to the other members of the group and informed them that, "We are going to rip this guy off." Fish and Torres forcibly removed the driver, later identified as Thomas Peterson, from his vehicle, and proceeded to overpower him. Torres removed a blue windbreaker from Peterson and tied it over his head, while Fish used shoe laces to tie Peterson's hands behind his back. During this period, Ricky Fisher jumped on the hood of Peterson's vehicle and began smashing the windshield. Danny Rothering used the knife that Torres had displayed earlier in the evening at Diane Thunder's house to slash the vehicle's tires. Certain members of the group entered the vehicle, seized the radio and other valuable items, and placed them all in Torres' Camaro. Following the theft of these items from Peterson's vehicle, appellant Fish stated "Let's get rid of him." Fish, Torres, and Rothering tossed the bound and blindfolded Peterson into the back seat of Torres' Camaro, entered the automobile themselves, and traveled north on Highway 47.

Torres drove his automobile approximately a mile to a mile and a half north on Highway 47 to Camp 24 road, a dirt-covered logging road located on the Menominee Indian Reservation. Torres turned onto the dirt road, heading east, and as he followed the winding road through the wooded Reservation, Rothering asked the still bound and blindfolded Peterson if he had any money. When Peterson failed to respond, Rothering twice punched Peterson in the face. Torres continued down the dirt-covered road for about five or six miles until he reached that area of the Indian Reservation where the Napone Bridge crosses the Little West Branch of the Wolf River. At that point Fish, Torres, and Rothering exited Torres' automobile, removed Peterson from the back seat, and laid him on the dirt-covered logging road. Fish tied a cloth around Peterson's neck and appellants Fish and Torres, along with Rothering, pulled on the cloth thereby strangling Peterson as they dragged him along the dirt road. The cloth broke and Peterson's body went limp. Fish and Torres lifted the limp body and carried it into a wooded area where Fish gave instructions to stab the bound and blindfolded Peterson. Rothering used the knife that Torres had displayed earlier in the evening at Diane Thunder's house and stabbed the rear calf on each of Peterson's legs. Appellants Fish and Torres carried the bleeding and limp Peterson to the edge of the Wolf River and dumped him into the water so that his torso and head were submerged but his legs remained on shore. Fish placed his foot on Peterson's head in order to keep the head submerged under water and gave instructions to "stab him." Torres took the knife from Rothering and stabbed Peterson twice in the stomach. Peterson's body was then pushed out into the flowing water of the Wolf River.

Fish, Torres, and Rothering returned to Torres' Camaro, and after making a U-turn on the other side of the Napone Bridge, Torres proceeded west on Camp 24 road toward Highway 47. After traveling "a little ways down" the dirt-covered road, Torres stopped the automobile so that he could "get rid of the gloves" that he and Fish had been wearing during the attack of Peterson. Torres and Rothering buried the blood-stained gloves, a sheath containing the knife used to stab Peterson, and the various items stolen from Peterson's automobile in a nearby tree stump and covered the area with dirt. Fish, Torres, and Rothering then exited the Menominee Indian

Reservation, returned to the wayside, and picked up the other four members of the group. Upon entering Torres' automobile, Laurie Penass noticed that Fish, Torres, and Rothering all had blood stains on their clothes.

Torres drove the entire group to Fish's residence, located on the Menominee Indian Reservation in Zor, Wisconsin, and after their arrival, Fish, Torres, and Rothering changed out of their blood-stained clothes. Later that morning Fish instructed Rothering to "[g]et rid of [his] clothes. Just say we were riding around drinking beer." Torres' sister, Anita, instructed Laurie Penass not to "say anything now, because everybody is afraid that you are the only one that's going to say something."

At approximately 6:00 a.m. on the morning of July 30, 1982, Officer Snow of the Menominee Tribal Police Force received a radio dispatch from Officer Bovene to proceed to the wayside on Highway 47, where Officer Bovene and two members of the Menominee Sheriff's Department had discovered Peterson's abandoned and vandalized automobile. Upon his arrival, Officer Snow was instructed to search Camp 24 road on the Menominee Indian Reservation, in the area of the Napone Bridge. Snow proceeded to the bridge and at approximately 8:00 a.m., he detected a blue object that had become "snagged" in the Wolf River, about one hundred yards downstream from the Napone Bridge. Upon closer examination, Officer Snow believed the object to be a human body with hands tied behind the back and a blue windbreaker covering the head. Snow immediately returned to his squad car and radioed for assistance. When additional officers arrived at the scene, the body was removed from the Wolf River and sealed in a plastic body bag. Later that evening, Dr. Huntington, a professor of pathology at the

University of Wisconsin-Madison Medical School, performed an autopsy and determined that the person, a Caucasian identified by the Federal Bureau of Investigation as a Thomas Peterson, died of "multiple modes of homicidal assault." Dr. Huntington listed those modes specifically as "[b]lunt injury, drowning while restrained, deep cutting in the abdomen, and strangulation." Dr. Huntington stated that due to the amount of water and debris in the victim's lungs, Peterson was still alive when he was submerged beneath the water.

On August 25, 1982, a Federal Grand Jury returned a three count indictment against Tony Fish and Ramon Torres for first degree murder in violation of 18 U.S.C. §§ 1111, 1153, conspiracy to commit murder in violation of 18 U.S.C. §§ 1117, 1152, and kidnaping in violation of 18 U.S.C. §§ 1201, 1153.[1] Following a trial in the United States District Court for the Eastern District of Wisconsin, the jury found appellants Fish and Torres guilty of conspiracy to commit murder, kidnaping, and the lesser included offense of second degree murder. The trial judge entered judgments of conviction and sentenced each appellant to three consecutive terms of life imprisonment. On appeal, Fish and Torres contend that the Government's evidence was insufficient to prove that the crimes were punishable in Federal court and, in the alternative, that the sentences imposed by the district court were improper.

II

The appellants were prosecuted for first degree murder and kidnaping under the Major Crimes Act, 18 U.S.C. § 1153, and for conspiracy to commit murder under the General Crimes Act, 18 U.S.C. § 1152.[2] In order to prosecute un-

---

**1.** Appellants Fish and Torres were prosecuted under Federal statutes due to their enrollment in the Menominee Indian Tribe and the fact that the alleged murder occurred on a Federal Indian Reservation. It appears from the record that Rothering was not a member of an Indian tribe and, therefore, was not prosecuted in the same

case with the appellants Torres and Fish. *See* 18 U.S.C. §§ 1152, 1153.

**2.** We note that conspiracy to commit murder is not one of the fourteen enumerated crimes of the Major Crimes Act, 18 U.S.C. § 1153, thus, the Government prosecuted the charge of con-

der 18 U.S.C. § 1153, the Government must prove, as a jurisdictional requisite, that an Indian committed one of fourteen enumerated crimes against another Indian, or any person, within Indian country.[3] *See United ed States v. Antelope,* 430 U.S. 641, 646–47 n. 7, 97 S.Ct. 1395, 1398–99 n. 7, 51 L.Ed.2d 701 (1977); *United States v. Jewett,* 438 F.2d 495, 497 (8th Cir.), *cert. denied,* 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 117 (1971); F. Cohen, *Handbook of Federal Indian Law,* 300–04 (1982). In order to prosecute under 18 U.S.C. § 1152, the Government must prove, as a jurisdictional requisite, that the crime was in violation of a Federal enclave law, and that the crime occurred between an Indian and a non-Indian within Indian country.[4] *See United States v. Wheeler,* 435 U.S. 313, 324–25, 98 S.Ct. 1079, 1086–87, 55 L.Ed.2d 303 (1978); *United States v. Blue,* 722 F.2d 383, 384–85 (8th Cir.1983); *United States v. John,* 587 F.2d 683, 686–87 (5th Cir.) (on remand from the United States Supreme Court), *cert. denied,* 441 U.S. 925, 99 S.Ct. 2036, 60 L.Ed.2d 399 (1979); F. Cohen, *Handbook of Federal Indian Law,* 287–300 (1982). The appellants contend that the evidence introduced at trial was insufficient to prove the jurisdictional requisite of their Indian status for purposes of 18 U.S.C. § 1153, and further, that the district court erred by failing to instruct the jury on the jurisdictional requisite of Peterson's non-Indian status for purposes of 18 U.S.C. § 1152. In addition, the appellants claim that the evidence clearly showed that the conspiracy to commit murder and the kidnaping originated in non-Indian country, and thus

should have been prosecuted in the Wisconsin state court system.

■ We initially address the appellants' jurisdictional claim under 18 U.S.C. § 1153, which provides:

"Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder ... kidnaping ... within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States."

According to this language, in order to prosecute the appellants under 18 U.S.C. § 1153, the Government had to establish that the appellants were Indians who committed murder and kidnaping against an Indian, or any other person, within Indian country. In the instant case, the indictment charged that appellants Fish and Torres were "Indians" who committed first degree murder in violation of 18 U.S.C. § 1111, and kidnaping in violation of 18 U.S.C. § 1201, against the person of Thomas Peterson, within "Indian country." Thus, the indictment contained sufficient information to invoke federal jurisdiction under 18 U.S.C. § 1153. *See United States v. Broncheau,* 597 F.2d 1260, 1262–63 (9th Cir.), *cert. denied,* 444 U.S. 859, 100 S.Ct. 123, 62 L.Ed.2d 80 (1979); *United States v. Indian Boy X,* 565 F.2d 585, 594 (9th Cir.), *cert. denied,* 439 U.S. 841, 99 S.Ct. 131, 58 L.Ed.2d 139 (1978). *Cf. United States v. Heath,* 509 F.2d 16, 20 (9th Cir.1974) (tribal enrollment sufficient to allege jurisdiction under 18 U.S.C. § 1152). The question then becomes whether the evidence intro-

---

spiracy to commit murder under the General Crimes Act, 18 U.S.C. § 1152. *See* Footnote 3.

**3.** The fourteen enumerated crimes of the Major Crimes Act, 18 U.S.C. § 1153, include murder, manslaughter, kidnaping, rape, carnal knowledge of any female, not (the defendant's) wife, who has not attained the age of sixteen years, assault with intent to commit rape, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury, arson, burglary, robbery, and larceny.

**4.** The United States Supreme Court has held that for purposes of 18 U.S.C. § 1152, crimes committed by non-Indians against non-Indians, in Indian country, are subject to state jurisdiction. *United States v. McBratney,* 104 U.S. 621, 26 L.Ed. 869 (1881); *New York ex rel. Ray v. Martin,* 326 U.S. 496, 66 S.Ct. 307, 90 L.Ed. 261 (1946). In addition, 18 U.S.C. § 1152 does not include offenses committed by one Indian against the person or property of another Indian, offenses where the Indian has been punished by the local law of the tribe, or offenses, which by treaty stipulation, are in the exclusive jurisdiction of the tribe.

duced at trial was sufficient to prove that appellants Fish and Torres, were, in fact, Indians and that the murder and kidnaping did, in fact, occur within Indian country.

It is a well-settled principle of Federal law that when the sufficiency of evidence in a criminal conviction is questioned, the reviewing tribunal examines the record in the light most favorable to the Government. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Carter,* 720 F.2d 941, 946 (7th Cir.1983). The record reveals that in the instant case, the Government introduced certificates of tribal enrollment, certifying that appellants Fish and Torres were each listed on the Menominee Tribal Roll.[5] Appellant Fish's certificate of enrollment provided that Tony Anthony Fish, identified as one of the defendants in this action, was born on November 11, 1961, was $^{25}/_{64}$ degree of Menominee Indian blood, and had been assigned Roll Number 00001077. Appellant Torres' certificate of enrollment provided that Ramon Joseph Torres, identified as the other defendant in this action, was born on August 28, 1962, was $^{11}/_{32}$ degree of Menominee Indian blood, and had been assigned Roll Number 00004246. Indeed, courts have held that uncontradicted evidence of tribal enrollment and a degree of Indian blood constitutes adequate proof that one is an Indian for purposes of 18 U.S.C. § 1153. As the court stated in

*United States v. Lossiah,* 537 F.2d 1250 (4th Cir.1976):

"Without objection, the Government introduced ... the certificate of the Tribal Enrollment officer of the Eastern band of Cherokee Indians that defendant is on Revised Roll No. 3902, was born May 8, 1943, and possesses three-fourths degree of Indian blood. *That was adequate proof that defendant was a Cherokee Indian.*" (emphasis added).

537 F.2d at 1251. *See also United States v. Dodge,* 538 F.2d 770, 786 (8th Cir.1976), *cert. denied sub nom. Alvarado v. United States,* 429 U.S. 1099, 97 S.Ct. 1119, 51 L.Ed.2d 547 (1977) (tribal enrollment and one-fourth Indian blood is sufficient proof that one is an Indian). Additionally, in *United States v. Antelope,* 430 U.S. 641, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977), proof that defendants were "enrolled members of the Coeur d'Alene Tribe and thus not emancipated from tribal relations," 430 U.S. at 646–47 n. 7, 97 S.Ct. at 1398–99 n. 7, was sufficient proof that defendants were Indians for purposes of Federal jurisdiction under 18 U.S.C. § 1153. In the instant case, the Government introduced not only the certificates of tribal enrollment, which included appellants' degree of Indian blood, but also certified copies of cancelled checks that the Menominee Tribal Enterprises had issued to Tony Fish and Ramon Torres as shared dividend payments. According to the testimony of Dolores Ninham, the payroll supervisor for the Menominee Tribal Enterprises, these shared dividend payments were made only to persons who appeared on the Menominee Tribal Roll.[6] In

---

5. Appellants argue that the certificates of enrollment constitute hearsay and are therefore inadmissible to prove appellants' Indian status. The record reveals that at trial, the Government introduced copies of the original Menominee Tribal Roll, in the form of certificates of enrollment which contained each appellant's name, birth date, and degree of Indian blood, and were prepared by Theresa Pitts, the enrollment clerk for the Menominee Indian Tribe. The Menominee Tribal Roll clearly constitutes a public record setting forth matters observed pursuant to a duty imposed by law as to which matter there was a duty to report. *See* 25 U.S.C. § 903b(c) (1982). Thus, pursuant to Fed.R. Evid. 803(8)(B), the Menominee Tribal Roll qualifies as an exception to the general hearsay

rule set forth in Fed.R.Evid. 802. Due to the fact that the Menominee Tribal Roll was admissible into evidence, the certificates of enrollment, prepared by the Menominee enrollment clerk and certified by her at trial to be accurate representations of the information contained in the original Tribal Roll, were admissible under Fed.R.Evid. 902(4) as certified copies of the original public record.

6. Appellants argue that the Government made no attempt to prove that the Tony Fish and Ramon Torres appearing on the Menominee Tribal Roll and the shared dividend checks issued by the Menominee Tribal Enterprises were, in fact, the defendants. However, at trial,

light of appellants' status as enrolled Indians of the Menominee Indian Tribe, and their receipt of shared dividend payments issued only to enrolled members of the Menominee Indian Tribe, we hold that there was ample evidence to support the jury's finding that appellants Fish and Torres were Indians for purposes of 18 U.S.C. § 1153.

■ Appellants further claim that the district court's jury instruction on what constitutes an Indian for purposes of 18 U.S.C. § 1153 was improper. The trial judge instructed the jury:

> "To be considered an Indian, a person must have some degree of Indian blood, and must be recognized as an Indian. In considering whether a person is recognized as an Indian, you may consider such factors, whether a person is recognized as an Indian by an Indian tribe, or society of Indians. Whether a person is recognized as an Indian by the federal government, whether a person resides on an Indian reservation, and whether a person holds himself out as an Indian. It is not necessary that all of these factors be present, rather you as jurors must consider the totality of circumstances in determining as a factual matter whether each defendant is an Indian."

Upon our review of relevant case law, it is clear that the district court's definition of what constitutes an Indian for purposes of 18 U.S.C. § 1153 is in accord with present Federal law. "The test, first suggested in *United States v. Rogers*, 45 U.S. 567, 4 How. 567, 11 L.Ed. 1105 (1845), and generally followed by the courts, considers (1) *the degree of Indian blood;* and (2) *tribal or governmental recognition as an Indian.*" (emphasis added) *United States v. Broncheau*, 597 F.2d at 1263. *See also United States v. Dodge*, 538 F.2d at 786; F. Cohen, *Handbook of Federal Indian*

*Law*, 23–27 (1982). In the instant case, the trial judge instructed the jury that in order to be considered an Indian, a person must have some degree of Indian blood and must be recognized as an Indian by the Indian tribe and/or the Federal government. Accordingly, we hold that the district court properly instructed the jury on the issue of what constitutes an Indian for purpose of 18 U.S.C. § 1153, and we will not disturb the jury's finding that appellants Fish and Torres were, in fact, Indians.

■ The appellants next jurisdictional claim is that the district court erred by failing to instruct the jury that in order to find Fish and Torres guilty of conspiracy to commit murder in violation of 18 U.S.C. § 1152, the jury had to find that Peterson was a non-Indian. The statute in question, 18 U.S.C. § 1152, provides:

> "Except as otherwise provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.
>
> This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively."

According to the appellants, the second paragraph of 18 U.S.C. § 1152 requires the Government to prove as a jurisdictional element of its case, that the conspiracy to commit murder was not committed by one Indian against the person or property of

---

the defendants introduced no evidence to show that they were not the Tony Fish and Ramon Torres who were identified on the Tribal Roll and who received the shared dividend checks from Menominee Tribal Enterprises. In light of the Government's uncontradicted evidence, it was reasonable for the jury to infer that the

Tony Fish and Ramon Torres appearing on the Menominee Tribal Roll and the shared dividend checks, were, in fact, the defendants. *See Corona-Palomera v. Immigration and Naturalization Service*, 661 F.2d 814, 816–17 (9th Cir.1981) (and cases cited therein).

another Indian.[7] Appellants claim that Peterson's non-Indian status was a question of fact to be decided by the jury and the district court's failure to instruct the jury on this jurisdictional element constitutes plain error.

In *Famous Smith v. United States,* 151 U.S. 50, 14 S.Ct. 234, 38 L.Ed. 67 (1894), the United States Supreme Court interpreted Rev.Stat. §§ 2145, 2146,[8] the predecessor of 18 U.S.C. § 1152, *see United States v. Cowboy,* 694 F.2d 1228, 1232–33 (10th Cir. 1982), and stated: "That [the victim] was a white man, and not an Indian, was a fact which the government was bound to establish, and if it failed to introduce any evidence upon that point, the defendant was entitled to an instruction to that effect." 151 U.S. at 55, 14 S.Ct. at 235, 38 L.Ed. 67. Two years later, the Court, in *Lucas v. United States,* 163 U.S. 612, 16 S.Ct. 1168, 41 L.Ed. 282 (1896), again interpreted Rev. Stat. §§ 2145, 2146 and stated that "[t]he burden of proof was on the government to sustain the jurisdiction of the court by evidence as to the status of the deceased, and the question should have gone to the jury as one of fact and not of presumption."

163 U.S. at 617, 16 S.Ct. at 1170. Based upon the Court's foregoing analysis of Rev. Stat. §§ 2145, 2146; the predecessor of 18 U.S.C. § 1152, it is apparent that for purposes of 18 U.S.C. § 1152, the jury must determine, as a question of fact, the victim's status as an Indian or non-Indian.[9] *See also* 42 C.J.S. Indians § 83(a) (1944).

In the instant case, the district court instructed the jury that:

"In order to establish the offense of conspiracy, the government must prove these elements beyond a reasonable doubt, one, that the alleged conspiracy existed, and, two, that an overt action was committed in furtherance of the conspiracy, three, that the defendant knowingly and intentionally became a member of the conspiracy, and, of course, four that the defendant is an Indian and, five, that the conspiracy occurred within Indian country."

For purposes of 18 U.S.C. § 1152, the Government had to prove not only that Fish and Torres were Indians but also that the victim, Peterson, was a non-Indian. *See* F. Cohen, *Handbook of Federal Indi-*

---

**7.** The United States Supreme Court stated in *United States v. Antelope,* 430 U.S. 641, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977), that "[e]xcept for the offenses enumerated in the Major Crimes Act, all crimes committed by enrolled Indians against other Indians in Indian country are subject to the jurisdiction of tribal courts." 430 U.S. at 643 n. 2, 97 S.Ct. at 1397 n. 2. *See also United States v. Johnson,* 637 F.2d 1224, 1231 (9th Cir.1980); *United States v. Smith,* 562 F.2d 453, 457 (7th Cir.1977), *cert. denied,* 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978). Thus, under 18 U.S.C. § 1152, if the crime was committed by one Indian against another Indian, the tribal court would retain jurisdiction.

**8.** Rev.Stat. § 2145 provided that "except as to crimes the punishment of which is expressly provided for in this Title, the general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country." *Famous Smith v. United States,* 151 U.S. at 53, 14 S.Ct. at 235.

Rev.Stat. § 2146 provided that "the preceding section shall not be construed to extend to crimes committed by one Indian against the person or property of another Indian, nor to

any Indian committing any offence in the Indian country who has been punished by the local law of the tribe, nor to any case where by treaty stipulations the exclusive jurisdiction over such offences is or may be secured to the Indian tribes respectively." *Id.*

**9.** We note that in *Henry v. United States,* 432 F.2d 114 (9th Cir.1970), *modified on other grounds,* 434 F.2d 1283 (9th Cir.1971), *cert. denied,* 400 U.S. 1011, 91 S.Ct. 576, 27 L.Ed.2d 625 (1971), the Government prosecuted a rape charge under 18 U.S.C. § 1152, even though rape was one of the fourteen enumerated crimes of the Major Crimes Act and thus should have been prosecuted under 18 U.S.C. § 1153. For purposes of 18 U.S.C. § 1152, the court instructed the jury as follows:

"First: that the offense was committed within the Indian Country as they find in these instructions.

Second: that the defendant is an Indian *and the victim is not an Indian.*

Third: that the defendant had sexual intercourse with the victim.

And Fourth: that the act was committed forcibly and against the will of the victim." (emphasis added).

432 F.2d at 117 n. 1.

*an Law,* 301 n. 157 (1982) (allegation and proof that the crime was interracial).[10] The record reveals that the district court never instructed the jury on Peterson's non-Indian status. The record further reveals that appellants Fish and Torres never objected to the above jury instruction at the time of the jury instruction conference, immediately after the jury instruction was given by the trial judge, or at any time before the jury retired to consider its verdict. According to Fed.R.Crim.P. 30:

> "[T]he court shall instruct the jury after the arguments are completed. *No party may assign as error any portion of the charge of omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." (emphasis added).*

In the instant case, the appellants failed to file a timely objection to the jury instruction, and thereby allow the district court to correct its instruction on the charge of conspiracy to commit murder. Accordingly, the appellants have waived their claim of an improper jury instruction on this appeal. *United States v. Verkuilen,* 690 F.2d 648, 652–53 (7th Cir.1982); *United States v. Jackson,* 569 F.2d 1003, 1008–10 (7th Cir.1978) (*"Jackson "*).

■ Despite the appellants waiver on the issue of the improper jury instruction, this court must still determine if the trial court's failure to instruct the jury on Peterson's non-Indian status constituted "plain error." Fed.R.Crim.P. 52(b); *United States v. Verkuilen,* 690 F.2d at 653; *Jackson,* 569 F.2d at 1010. As we stated in *Jackson,* "[i]n deciding whether a defect in a jury instruction is 'plain error,' we must examine the entire record before us, and determine whether the instructional mistake had a probable impact on the jury's

finding that the defendant was guilty." (citations omitted). 569 F.2d at 1010. *See also United States v. Verkuilen,* 690 F.2d at 653. Based upon our review of the record and the applicable case law, it is clear that in the instant case, the district court's failure to submit the question of Peterson's non-Indian status to the jury did not impact upon the jury's finding of guilty, and thus did not constitute plain error.

■ At trial, the Government introduced into evidence an eleven page autopsy report, prepared by the pathologist, Dr. Huntington, that referred to Peterson as "a somewhat obese *Caucasian* male appearing to be of middle age." (emphasis added). In addition, the jury observed several photographs of Peterson before and after his death, each of which revealed that Peterson was a white man with Caucasian features. Finally, the indictment that was read to the jury immediately preceding the conspiracy instruction, referred to Peterson as a non-Indian. At no time throughout the entire trial did appellants Fish and Torres ever suggest, challenge, or even attempt to elicit evidence that Peterson *was* an Indian. As a result, when Fish and Torres moved, at the close of all the evidence, to dismiss the conspiracy charge under 18 U.S.C. § 1152, for the Government's failure to establish Peterson's non-Indian status, the district court denied the motion and ruled that, "I think there's evidence in the case, from which [Peterson's non-Indian status] can be amply determined.... You have got photographs. You have got residence." We agree with the district court that the record contained ample evidence, including the reference to Peterson as a Caucasian in the autopsy report, the photographs, and the reference to Peterson as a non-Indian in the indictment, to find

---

**10.** In *United States v. Sosseur,* 181 F.2d 873, 875 (7th Cir.1950), this court referred to the three exceptions contained in the second paragraph of 18 U.S.C. § 1152 as "defenses." Though the use of the term "defenses" appears to confuse the burden of proof on the issue of non-Indian status under 18 U.S.C. § 1152, the court cleared that confusion when it later, in the same opinion, referred to the three exceptions as "three conditions." Indeed, for purposes of 18 U.S.C. § 1152, the Government must satisfy the first "condition" and prove that the "crime was interracial." F. Cohen, *Handbook of Federal Indian Law,* 301 n. 157 (1982). *See also United States v. Wheeler,* 435 U.S. at 324–25, 98 S.Ct. at 1086–87.

that Peterson was a non-Indian. Accordingly, we hold that in light of the totality of the circumstances, the district court's failure to instruct the jury on the issue of Peterson's non-Indian status did not impact upon the jury's finding of guilt and, therefore, did not constitute plain error.

The appellants' next jurisdictional claim is that the Government, for purposes of 18 U.S.C. §§ 1152 and 1153, had to prove that the crimes of first degree murder, conspiracy to commit murder, and kidnaping were all committed within Indian country. Appellants do not contest the fact that the murder occurred in Indian country, rather the appellants claim that, according to the Government's evidence, the conspiracy to commit murder and the kidnaping originated outside the Menominee Indian Reservation, at the wayside in Shawno County. To support their position, the appellants rely upon the evidence presented at trial which showed that the plan to "get rid of" Peterson was first discussed and entered into at the wayside, and that the abduction of Peterson, including the binding of his hands and the blindfolding of his eyes, was initiated at the wayside. The evidence further revealed that the wayside only bordered the Menominee Indian Reservation and was not located within Indian country. Appellants contend that because the conspiracy to commit murder and the kidnaping originated outside of Indian country, the crimes should have been prosecuted in the Wisconsin state court system rather than in the Federal district court.

 It is undisputed that the Wisconsin state court has jurisdiction to punish an Indian who commits a crime off the Menominee Indian Reservation, and within state territory, if such crime is in violation of state law. *Sturdevant v. State,* 76 Wis.2d 247, 250–51 251 N.W.2d 50, 52–53, *cert. denied,* 431 U.S. 970, 97 S.Ct. 2931, 53 L.Ed.2d 1067 (1977). *See also Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–49, 93 S.Ct. 1267, 1270–71, 36 L.Ed.2d 114 (1973); *Organized Village of Kake v. Egan,* 369 U.S. 60, 75, 82 S.Ct. 562, 570, 7 L.Ed.2d 573 (1962). It is equally clear, however, that under 18 U.S.C. § 1152, the Federal court has exclusive jurisdiction to punish an Indian who participates in a conspiracy to murder a non-Indian within the federal territory of the Menominee Indian Reservation, provided that the Indian has not been punished by the tribe and the crime is not in the exclusive jurisdiction of the tribe.[11] *Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 270, 3 L.Ed.2d 251 (1959) (jurisdiction conferred by Congress over a crime involving an Indian is exclusive); *United States v. John,* 587 F.2d at 687 (Congress has stripped the states of power to punish Indians for offenses committed against non-Indians in Indian country). Such federal jurisdiction attaches if "at least one of the conspirators commits an overt act in the territorial jurisdiction of the United States district court." *United States v. Schmucker-Bula,* 609 F.2d 399, 402 (7th Cir.1980). *See also United States v. Winter,* 509 F.2d 975, 982 (5th Cir.), *cert. denied sub nom. Parks v. United States,* 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); *United States v. Lawson,* 507 F.2d 433, 445 (7th Cir.1974), *cert. denied,* 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975). Similarly, it is clear that under 18 U.S.C. § 1153, the Federal court has exclusive jurisdiction to punish an Indian who kidnaps a non-Indian within the federal territory of the Menominee Indian Reservation.[12] *Williams v. Lee,* 358 U.S. at 220, 79

**11.** Between August 1954, and March 1976, the State of Wisconsin had criminal jurisdiction over the Menominee Indian Reservation. *See* 18 U.S.C. § 1162 (1982). Pursuant to 25 U.S.C. § 1323 (1982), the State of Wisconsin retroceded its criminal jurisdiction over the Menominee Indian Reservation to the United States, effective March 1, 1976. *See Latender v. Israel,* 584 F.2d 817, 818 (7th Cir.1978), *cert. denied,* 440 U.S. 985, 99 S.Ct. 1800, 60 L.Ed.2d 247 (1979);

*State ex rel. Pyatskowit v. Montour,* 72 Wis.2d 277, 280–82, 240 N.W.2d 186, 187–88 (1976).

**12.** See footnote 11.

We note that the tribal court may have concurrent jurisdiction if an Indian commits one of the fourteen enumerated crimes of 18 U.S.C. § 1153 against another Indian. *See Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 203–04 n. 14, 98 S.Ct. 1011, 1018–19 n. 14, 55 L.Ed.2d 209

S.Ct. at 270; *United States v. John*, 587 F.2d at 687. *Cf. Solem v. Bartlett*, —— U.S. ——, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984) (state has no jurisdiction to prosecute an Indian who commits rape in Indian country). Federal jurisdiction attaches if any portion of the kidnapping occurs within the territorial jurisdiction of the United States. 18 U.S.C. § 1201(a)(2). *See also United States v. Lewis*, 662 F.2d 1087, 1089–90 (4th Cir.1981), *cert. denied*, 455 U.S. 955, 102 S.Ct. 1464, 71 L.Ed.2d 672 (1982).

■ In the instant case, the appellants were prosecuted for conspiracy to murder, under 18 U.S.C. § 1117, which provides that "[i]f two or more persons conspire to violate section 1111, [murder within the territorial jurisdiction of the United States,] and one or more of such persons do any act to effect the object of the conspiracy, each shall be punished by imprisonment for any term of years or for life." The uncontradicted testimony at trial revealed that the major portion of appellants' on-going conspiracy to "get rid of" Peterson occurred on the Menominee Indian Reservation. The appellants agreed to murder Peterson, and in order to effect that object, transported Peterson five or six miles through the Reservation to the location of the Napone Bridge. While on the Reservation, appellants tied a cloth around Peterson's neck and strangled him as they dragged him along the dirt-covered road, carried Peterson into the woods and stabbed him in both legs, tossed Peterson into the Wolf River so that his head remained submerged under water, and stabbed Peterson in the abdominal region. Further, the Federal kidnaping statute under which appellants were prosecuted, 18 U.S.C. § 1201 provides that "[w]hoever unlawfully … confines … any person … when … any such act is done within the territorial jurisdiction of the United States, shall be punished by imprisonment for any term of years or for

life." The uncontradicted testimony at trial also revealed that the major portion of the appellants' on-going kidnaping of Peterson occurred on the Menominee Indian Reservation. The appellants overpowered Peterson at the wayside, tied his hands, blindfolded him, tossed him into Torres' automobile and then drove onto the Reservation. Peterson remained bound, blindfolded, and forcibly confined in Torres' automobile as the appellants proceeded five or six miles through the Reservation along Camp 24 road. After arriving at the Napone Bridge, appellants kept Peterson's hands tied and his eyes blindfolded as they strangled him, dragged him along the dirt-covered road, stabbed him, and submerged his head under water. This uncontradicted evidence clearly reveals that the appellants conspired to murder Peterson in violation of 18 U.S.C. § 1117 and that the appellants forcibly confined Peterson in violation of 18 U.S.C. § 1201. Moreover, the evidence clearly reveals that these on-going crimes occurred within the federal territory of the Menominee Indian Reservation. Accordingly, we hold that under 18 U.S.C. §§ 1152, 1153, the United States District Court for the Eastern District of Wisconsin had jurisdiction to punish appellants Fish and Torres for their participation in the conspiracy to commit murder, in violation of 18 U.S.C. § 1117, and their kidnapping in violation of 18 U.S.C. § 1201, on the Menominee Indian Reservation.

■ Appellants next contend that the testimony of Agent Richard Reem, a blood analyst for the Federal Bureau of Investigation, was unduly prejudicial. At trial, Agent Reem was qualified as an expert in blood analysis and testified that he found blood on the knife used to stab Peterson, the knife sheath, and on three of the gloves found buried in the tree stump on the Menominee Indian Reservation. Reem further testified that he was unable to deter-

(1978); *United States v. Broncheau*, 597 F.2d at 1264–65; *United States v. John*, 587 F.2d at 686 n. 6. However, according to the United States Supreme Court "[s]ince tribal and federal prosecutions are brought by separate sovereigns, they

are not 'for the same offence,' and the double jeopardy clause thus does not bar one when the other has occurred." *United States v. Wheeler*, 435 U.S. at 329–30, 98 S.Ct. at 1089–90.

mine if the blood spots on the knife were human blood but he did confirm that the blood spots appearing on the knife sheath and the three gloves were, in fact, human blood. Reem marked the blood spots appearing on all the exhibits but could only identify the blood type of one spot that appeared on one of the gloves. Reem testified that the glove contained type O blood. Following the close of the Government's case, the defendants moved to strike Agent Reem's testimony due to the Government's failure to establish the requisite chain of custody for the knife, sheath, and gloves. The court granted defendants' motion to strike the testimony but denied a motion for mistrial because "there is a lot of additional testimony with respect to blood at various places in the testimony of the case, so I don't think the mere existence of blood in and of itself means a mistrial has to be granted ...." The court then recited a specific cautionary instruction to the jury, requesting them to exclude and disregard Agent Reem's testimony.

"The testimony of Special Agent Reem related to observations that he made of these items of evidence, but in his testimony, there was no establishment of the unfailing chain of custody from the time that those items were taken into the possession of the authority until he examined them, and the law views that as a fatal flaw because there's always the fact that you could have contamination or various sorts of problems with whatever the substance was or whatever the mark was or whatever it was that you were having the expert analyze. For that reason, you are advised by the Court that you should disregard it in its entirety the evidence of Special Agent Reem. I know it's difficult, but you're sworn to observe the directions of the Court with reference to the evidence, and I am telling you that that evidence should be excluded from your mind. As you enter your deliberations at the conclusion of this case, don't consider in any fashion the testimony of Special Agent Reem this afternoon. Is that clear to everyone on the jury? All right."

At the time of the final jury instructions, the district court recited a second specific cautionary instruction to the jury, requesting them to "consider only the evidence received in this case.... [Y]ou are to disregard any evidence to which I sustained an objection, or which I ordered stricken. In this regard you are to disregard the testimony of Special Agent Reem."

In order to determine the prejudicial impact of Agent Reem's stricken testimony, we must place such testimony "[i]n the context of the entire trial." *United States v. Lawson*, 507 F.2d at 437. A review of the trial record reveals that the blood-stained knife, sheath, and gloves had already been admitted in evidence and observed by the jury before Agent Reem testified. In addition, the Government had already introduced uncontradicted evidence that the knife was used to stab Peterson, appellants Fish and Torres wore gloves during the stabbing, the blood-stained gloves were buried in a tree stump following the stabbing, appellants had blood-stained clothes when they returned to the "wayside," and upon their arrival at Fish's residence on the morning of July 30, 1982, appellants changed out of their blood-stained clothes. Thus, Agent Reem's testimony that human blood spots appeared on the sheath and the three gloves was merely cumulative evidence. In effect, the only evidence added by Agent Reem was that one of the gloves contained type O blood. Though Dr. Huntington, the pathologist, had earlier identified Peterson's blood as type O, the impact of Agent Reem's testimony was substantially lessened by his inability to determine the type of blood present on the knife, sheath, and the other two gloves, Dr. Huntington's admission to defense counsel that "type O blood is fairly common," and the total lack of evidence that the type O blood appearing on the glove was that of the victim, Peterson. Moreover, the record reveals that the Government introduced Agent Reem's testimony in good faith and was unable to establish a proper chain of custody because the testimony was stricken, upon defense

counsel's objection, after the close of the Government's case. Accordingly, we agree with this court's language in *United States v. Lawson,* that "[i]n the context of the entire trial, ... reversible error was avoided by the district court's action in striking the testimony and instructing the jury to disregard [such] testimony ...." *Id.* In light of the totality of the circumstances, including the district court's specific cautionary instructions to disregard Agent Reem's testimony, after granting the motion to strike and again at the close of trial, and the cumulative nature of the testimony, we hold that the stricken evidence did not unduly prejudice the appellants and thus the district court's denial of the defendants' motion for mistrial was proper. *Accord Id.; United States v. Catalano,* 450 F.2d 985, 990 (7th Cir.1971), *cert. denied sub nom. Moscatello v. United States,* 405 U.S. 928, 92 S.Ct. 980, 30 L.Ed.2d 802 (1972).

Appellants finally contend that the district court committed reversible error by sentencing each of them to three consecutive life sentences. Appellants claim that the district court mechanically imposed sentence because it failed to consider individual factors, improperly considered appellants' status as Indians and the occurrence of unrelated crimes on the Menominee Indian Reservation, and speculated as to appellants' release by the Parole Commission. Appellants do not contest the fact that the crimes for which they were convicted, second degree murder in violation of 18 U.S.C. § 1111, conspiracy to commit murder in violation of 18 U.S.C. § 1117, and kidnaping in violation of 18 U.S.C. § 1201, each carry a maximum penalty of life imprisonment.

The law is well-settled that a trial judge "has wide discretion in sentencing and his exercise of that discretion will not be disturbed absent a showing of gross abuse." *United States v. Wilkins,* 659 F.2d 769, 773 (7th Cir.), *cert. denied,* 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981) (citing *United States v. Willard,* 445 F.2d 814, 816 (7th Cir.1971)); *United States v. Hedman,* 630 F.2d 1184, 1201 (7th Cir.1980),

*cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981). Furthermore, "a sentence within the statutory maximum provided by Congress is only subject to review on appeal for manifest abuse of discretion." *United States v. Carter,* 720 F.2d 941, 951 (7th Cir.1983); *United States v. Madison,* 689 F.2d 1300, 1312 (7th Cir. 1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 754, 74 L.Ed.2d 971 (1983); *United States v. Main,* 598 F.2d 1086, 1094 (7th Cir.), *cert. denied,* 444 U.S. 943, 100 S.Ct. 301, 62 L.Ed.2d 311 (1979).

In the instant case, the trial judge observed appellants Fish and Torres throughout the trial, thoroughly reviewed the presentence reports, listened to the defense counsels' statements of mitigation, and afforded appellants a right of elocution. In addition, at the sentencing hearing the trial judge reviewed the evidence presented at trial and made express reference to each appellant's individual record and personal life before imposing sentence. The trial judge's reference to other crimes committed on the Menominee Indian Reservation and his comment that "I think its imperative that a message go forth to the Menominee Nation," was well within the judge's discretion to consider general deterrence when imposing sentence. As this court stated in *United States v. Brubaker,* 663 F.2d 764 (7th Cir.1981), "[c]onsideration of general deterrence is proper provided that it does not result in a mechanistic imposition of sentence." 663 F.2d at 769 (citing *United States v. Miller,* 589 F.2d 1117, 1138 (1st Cir.1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979)). The trial judge's consideration of each appellant's individual record and his comments on each appellant's personal life before imposing sentence clearly demonstrates that the three consecutive life sentences were not mechanically imposed. Moreover, the judge's remark that "when you get over 30 years you don't stack life sentences as far as impact on parole is concerned" was in no way a speculation as to when the Parole Commission would release appellants. Indeed, the trial judge

added that "regardless of what I do here, [defendants' futures are] pretty largely in the hands of the prison authorities and the parole board." Accordingly, we hold that the trial judge did not abuse his discretion by sentencing appellants Fish and Torres to the maximum statutory penalty of three consecutive terms of life imprisonment.

### III

The judgments of conviction are affirmed.