Mac T. HALL, Appellant,

v.

UNITED STATES of America, Appellee.

No. 18282.

United States Court of Appeals Fifth Circuit.

Dec. 23, 1960.

Rehearing Denied Jan. 31, 1961.

Howard Dailey, Jerome Chamberlain, Dallas, Tex., for appellant.

Minor Morgan, Asst. U. S. Atty., Dallas, Tex., W. B. West, III, U. S. Atty., Fort Worth, Tex., for appellee.

Before RIVES, BROWN and WISDOM, Circuit Judges.

RIVES, Circuit Judge.

Tried to the court without a jury,[1] Hall was found guilty on Counts 1, 10, 11 and 12 of the indictment and was sentenced to imprisonment for two years. His appeal presents the single question of the sufficiency of the evidence to sustain the judgment of conviction.

The Government calls attention that no motion for judgment of acquittal was made in accordance with Rule 29(a), Federal Rules of Criminal Procedure, and insists that the applicable test for review is that "the error must be such as would result in manifest miscarriage of justice or affect seriously the fairness of judicial proceedings."[2] In a case tried to a jury, the writer, as the organ of this Court, has stated that in the absence of such a motion "the evidence will be reviewed by this Court only to prevent a manifest miscarriage of justice."[3] The rule was, however, otherwise, and perhaps better, stated for this Court by Judge Foster in Collins v. United States, 5 Cir., 1933, 65 F.2d 545, 546, as follows:

"It is well settled that, where there is no substantial evidence to support a conviction in a criminal case, it is the duty of the trial court to direct a verdict of acquittal, regardless of whether a motion to that effect is made. If from the record or facts of which the court may take notice it appears that the conviction cannot be sustained, plain error appears on the record, and the judgment will be reversed. Clyatt v. U.

S., 197 U.S. 207, 25 S.Ct. 429, 49 L.Ed. 726; Gambino v. U. S., 275 U.S. 310, 48 S.Ct. 137, 72 L.Ed. 293, 52 A.L.R. 1381."

Further, Rule 29(a) is now so worded as to require the court "of its own motion" to order the entry of a judgment of acquittal if the evidence is insufficient to sustain a conviction.[4]

In any event, there can be little or no need for a formal motion for a judgment of acquittal in a criminal case tried to a court without a jury upon the defendant's plea of not guilty. The plea of not guilty asks the court for a judgment of acquittal, and a motion to the same end is not necessary. De Luna v. United States, 5 Cir., 1955, 228 F.2d 114, 116. In such a case, therefore, we hold that the sufficiency of the evidence to sustain a conviction should be reviewed the same as if there had been a formal motion for judgment of acquittal.

Count 1 charged that Hall did "unlawfully, knowingly, and willfully aid, abet and induce"[5] one James Cook Evans, an Assistant Vice President, Collection Department, First National Bank of Dallas, Texas, to knowingly, unlawfully, willfully and feloniously make a false entry in one of the bank's books to the effect that at the close of business on October 9, 1959, the cash items section of said bank held valid cash items totaling $5,606,-872.52; whereas, in truth and in fact, said Evans then well knew that said figure was overstated and included worthless and unsecured drafts and checks payable through said bank in the total sum

---

1. See Rule 23(a), Federal Rules of Criminal Procedure, 18 U.S.C.A.

2. Quoted from United States v. Safur, 7 Cir., 1958, 251 F.2d 30, 31, in turn quoting United States v. Vasen, 7 Cir.. 1955, 222 F.2d 3.

3. Demos v. United States, 5 Cir., 1953, 205 F.2d 596, 599, citing Thomas v. United States, 5 Cir., 189 F.2d 430.

4. "The court on motion of a defendant *or of its own motion* shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. * * *" (Emphasis supplied.) Rule 29(a), Federal Rules of Criminal Procedure.

5. "(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C.A. § 2(a).

of $243,949.78,[6] and that this total included drafts and checks previously drawn and caused to be drawn by Mac T. Hall in the sum of $4,360.13.[7]

Counts 10, 11 and 12 charged that Hall aided, abetted and induced Evans to willfully misapply moneys and credits of the bank to the use and benefit of Hall[8] by causing the bank to pay out of its moneys and credits certain particular drafts signed by Hall.[9]

The only really disputed issue was the criminal intent *vel non* of Hall. It is, of course, settled, as well stated by the Supreme Court in Nye & Nissen v. United States, 1949, 336 U.S. 613, 619, 69 S.Ct. 766, 769, 93 L.Ed. 919:

6. The evidence shows without dispute that the actual total of unpaid and unsecured drafts was $290,320.03.

7. Section 1005, Title 18 U.S.C.A., provides in part:
"Whoever makes any false entry in any book, report, or statement of such bank with intent to injure or defraud such bank, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, or the Board of Governors of the Federal Reserve System—
"Shall be fined not more than $5,000 or imprisoned not more than five years, or both."

8. Section 656 of Title 18 U.S.C.A., provides in pertinent part:
"§ 656. *Theft, embezzlement, or misapplication by bank officer or employee*

"Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or *insured* bank, or a receiver of a national bank, or any agent or employee of the receiver, or a Federal Reserve Agent, or an agent or employee of a Federal Reserve Agent or of the Board of Governors of the Federal Reserve System, embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employee or receiver, shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount embezzled, abstracted, purloined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both."

9. The drafts were described as follows:

Count 10:

| "Date | Payee | Amount | Maker | Drawn On |
|---|---|---|---|---|
| 5–15–59 | Southwestern Investment Company | $155.11 | Mac T. Hall | Midwest Refining Company, First National Bank, Dallas, Texas." |

Count 11:

| "Date | Payee | Amount | Maker | Drawn On |
|---|---|---|---|---|
| 6–15–59 | Southwestern Investment Company | $155.11 | Mac T. Hall | Midwest Refining Company, thru First National Bank in Dallas." |

Count 12:

| "Date | Payee | Amount | Maker | Drawn On |
|---|---|---|---|---|
| 7/11/59 | NEW MEXICO TIMBER CORPORATION | $500.00 | Mac T. Hall | Midwest Refining Company through First National Bank in Dallas." |

"In order to aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.' L. Hand, J., in United States v. Peoni, 2 Cir., 100 F.2d 401, 402."

Here, as in most cases, criminal intent *vel non* must be inferred from the facts and circumstances of the case. The test to be applied on review is whether the judge could reasonably find that the evidence excludes every reasonable hypothesis except that of guilt;[10] or, otherwise expressed, whether there was relevant evidence from which the judge could properly find or infer beyond a reasonable doubt that the accused is guilty.[11]

Evans admitted having made false entries in the books of the bank to conceal an over-all shortage of $290,320.03. A part of that shortage was represented by 154 unpaid drafts drawn by Hall in the aggregate amount of $4,360.13. Hall wrote the drafts and put them in circulation but had nothing to do with keeping the records.

Evans had been employed by the bank for thirty-four years and was in charge of the Collection Department. Evans had written a trust receipt[12] for these drafts, had signed the trust receipt Midwest Refining by Mac T. Hall, and had placed the trust receipt with the regular records of the bank. Prior to the accumulation of these unpaid drafts, Hall had over a period of several years (more than three or four years) drawn drafts in his name on Midwest Refining.[13] Some of those drafts had been paid by the end of the next business day. Just prior to May 6 or 7, 1959, there had been an accumulation of unpaid drafts in the amount of $1,839.43 which were paid, and Hall then had a zero balance in the Collection Department of the bank. Hall also carried a deposit in the bank but the amount of his deposit does not appear from the testimony. The 154 unpaid drafts drawn by Hall against Midwest Refining Company accumulated during the months of May through September 1959, with an unpaid balance at the end of each month as follows: May, $698.02; June, $1,860.64; July, $3,-431.59; August, $3,954.85; September, $4,360.13.

Hall and Evans had been close business associates for a number of years. Hall had done Evans a number of business favors. He had given to Evans, without charge, three or four oil and gas leases, thought to be of some value at the time of assignment but which proved to be worthless; he had issued to Evans four certificates of stock in Midwest Refining Company of a total value of $4,000.00, on which Evans had paid $1,300.00;[14] he had made Evans the beneficiary of a policy of life insurance, telling him "that he was having a lot of trouble and that in case anything happened to him and he should have any outstanding drafts this would take care of it."

Hall had talked willingly with the FBI agent who investigated the case, and Hall testified at length in his own behalf. He testified that he held oil leases on some 25,000 acres of land and that in his opinion those leases had value; that the Midwest Refining Company which he headed had real prospects for the building and operation of a refinery; and

10. See Cuthbert v. United States, 5 Cir., 1960, 278 F.2d 220, 224.

11. Riggs v. United States, 5 Cir., 1960, 280 F.2d 949, 955.

12. According to the evidence, a trust receipt is "commonly used by people to take items out of the bank for examination."

13. Midwest Refining Company was a corporation organized by Hall which had plans for the building of an oil and gas refinery at Albuquerque, New Mexico.

14. Each certificate was of the value of $1,000.00. The first certificate Evans received in August, 1957; the second on June 7, 1958; the third in July, 1958; and the fourth on March 26, 1959.

that he hoped to be able to pay the drafts. On cross-examination, he admitted that he had had large experience in banking and in the borrowing of moneys on promissory notes; that he had borrowed a lot of money and had dealt with many banks. He further admitted that he had never paid any interest on any draft which Evans had handled for him.[15]

At the conclusion of the evidence, the trial judge was in considerable doubt as to whether the necessary criminal intent had been proved, and called for letter briefs from the parties, stating:

> "I will say to counsel that there seems to me what we ordinarily term an absence of wilful and malicious intent to commit fraud, and yet that is not always required to constitute fraud. We have constructive frauds.

> "I am going to take this under advisement and if you gentlemen care to you might write me a three page letter which would show what you consider the fraud in this case. The fraud is not a wilful, malicious fraud, it is a friendship and an interest and an interchange of interest, apparently, between an officer of the bank and the defendant that is not countenanced by good banking; it might constitute the evil intent that the law requires."

Thereafter, the trial judge resolved his doubt as to criminal intent in favor of the Government, but nonetheless stated in imposing sentence on Hall that: "I will say this, however, I will impose a sentence of two years, but if you should correct the matter by returning to Mr. Evans' bank the money, and make restitution for the money you misapplied I would consider probation. I don't make that promise, but I will consider it."

■ Upon oral argument, the members of this Court were likewise impressed with serious doubt as to whether there was sufficient evidence to prove criminal intent on the part of Hall. At that time, we were assuming the necessity of proof beyond a reasonable doubt of Hall's intent not ultimately to pay the drafts. If that were essential, then we are still of the opinion that a judgment of acquittal should be entered. However, after a thorough study and consideration of the entire record, we have come to the conclusion that the proof need not go to that extent, and that the evidence was sufficient to support Hall's conviction on Counts 10, 11 and 12.[16]

■ The willful misapplication referred to in 18 U.S.C.A. § 656 must have been, in this case, a willful misapplication for the use or benefit either of Evans or of Hall with intent to injure and defraud the bank.[17] Evans was an experienced banker and Hall was a businessman of wide experience. The district court could rationally believe beyond a reasonable doubt that Hall knew that Evans was misapplying the funds of the bank in making repeated and substantial loans to Hall on unpaid and unsecured drafts

15. "Q. Have you ever paid any interest on any draft that Mr. Evans was taking care of for you? A. No, sir.
"Q. And he took care of them over an extended period? A. Yes.
"Q. As a matter of fact, the evidence is he took care of bank drafts for you on a number of occasions both before the beginning of the period shown on this chart and afterward, that is from 1957. He took care of drafts for you on a number of occasions before that? A. Yes.
"Q. For extended periods of time? A. Yes.

"Q. In substantial sums? A. Yes.
"Q. And never a penny of interest yet? A. That is right."

16. The general two-year sentence would be justified by Hall's conviction on any one count of the indictment, and we need not review the sufficiency of the evidence to support Hall's conviction on Count 1. See Abrams v. United States, 1919, 250 U.S. 616, 619, 40 S.Ct. 17, 63 L.Ed. 1173.

17. See United States v. Meyer, 5 Cir., 1959, 266 F.2d 747, 754.

and without charging any interest.[18] See Logsdon v. United States, 6 Cir., 1958, 253 F.2d 12, 14, 15. The fact that Hall intended that the principal amount should ultimately be repaid to the bank is no defense. As was well said by Judge Prettyman, speaking for the Fourth Circuit, in Rakes v. United States, 4 Cir., 1948, 169 F.2d 739, 746:

> "In the course of his pre-sentence discussion, the trial judge said that he felt that there was no intent on the part of Gardner and appellant 'eventually to take this money away from the bank' that 'they both thought they would get to pay it back'; that the income tax 'broke up' the contemplated loan from the insurance company, and that appellant at all times had sufficient assets to pay what he owed. Appellant construes these remarks as establishing that he had no criminal intent, and thus that the instruction to the jury on intent was erroneous and without foundation. Of course, what the court was saying, as the entire text of its discussion shows, was that appellant had assets to meet his debts, that he and Gardner planned to cover their transactions with the proceeds of the contemplated loan, and that when the negotiations for the loan failed the whole scheme collapsed, but that all this had nothing to do with the intent to misapply the funds of the bank. The slightest thought shows the correctness of the court's position. Many embezzlers fully intend to return the money they take, if a horse wins a race, or the stock market goes up, or if next month's expenses are not so heavy. Moreover, the fact that a man has assets does not negative an intent to steal; a rich man can be guilty of theft; the question is not what he has but what he takes and how he takes it."

 We conclude that the trial court could properly infer beyond a reasonable doubt that Hall had the requisite criminal intent.[19] The judgment is

Affirmed.

---

18. Evans testified that he could not recall any specific time, but that he had told Hall in connection with the accumulation of unpaid drafts "that I would probably lose my job if it came out."

19. In view of the district court's announced intention to consider probation, we deem it appropriate to call attention that under Rule 35, Federal Rules of Criminal Procedure, the district court has sixty (60) days after receipt of the mandate of affirmance in which to consider whether to reduce the sentence. That is a matter, however, left solely to the discretion of the district court.