# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 7, 2021

Lyle W. Cayce
Clerk

No. 20-50203

United States of America,

*Plaintiff—Appellee*,

*versus*

Justin Haggerty,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 3:10-CR-630-1

Before Haynes, Higginson, and Oldham, *Circuit Judges*.

Stephen A. Higginson, *Circuit Judge*:

After a stipulated-facts bench trial, Appellant Justin Haggerty was convicted of malicious injury of property located on "Indian country" in violation of 18 U.S.C. §§ 1152 and 1363. He was sentenced to 12 months and one day in prison, followed by three years of supervised release. He appeals his conviction and sentence. We AFFIRM.

No. 20-50203

## I. Background

According to the stipulated facts, on Columbus Day in 2017, Haggerty poured red paint on a statue of Nestora Piarote, an Indigenous woman, and placed a wooden cross in front of it. The statue was located in El Paso County, Texas, on land reserved to the Yselta Del Sur Indian Tribe (also known as the Tigua Indian Tribe). The tribe erected the statue to honor the women of their tribe and had unveiled it just three months earlier. It cost $92,000.[1] Law enforcement arrested Haggerty after linking him to the purchase of the wood and paint used in the crime. In addition, in the months preceding the crime, Haggerty had reposted or liked social media posts: (1) expressing concern that a statue of Christopher Columbus would be removed from Columbus Circle in New York City; (2) urging Catholics to unite to defend Columbus Day from being replaced by a "pagan" Indigenous Peoples' Day; and (3) stating that Catholic history was being erased.[2]

Although the factual stipulation described Haggerty as physically appearing to be a "white male" based on surveillance footage, neither the stipulation nor the indictment described whether Haggerty was Indian or non-Indian.

After being arrested and indicted under 18 U.S.C. §§ 1152 and 1363, Haggerty pleaded not guilty and moved to dismiss the indictment on the ground that § 1363 is unconstitutionally vague. The district court denied his motion and Haggerty waived a jury trial with the government's consent and district court's approval. At the commencement of the bench trial, the

---

[1] According to the Presentence Investigation Report ("PSR"), it cost the tribe $1,800 to repair the statue after it was damaged by Haggerty.

[2] As Haggerty acknowledged at sentencing, many in the Tigua Indian Tribe are practicing Catholics.

district court admitted the above-described and agreed-upon stipulation of facts, and both the Government and Haggerty closed their cases without presenting additional evidence or argument.

Based on the factual stipulation, the district court convicted Haggerty. In calculating the Guidelines range for purposes of sentencing, the court applied an enhancement pursuant to U.S.S.G. § 2B1.5 because the offense involved damage to a cultural heritage resource: the statue. Relevant here, the court increased Haggerty's offense level by six because it valued the statue at $92,000. *See* U.S.S.G. §§ 2B1.5(b)(1)(B), 2B1.1(b)(1). Haggerty's total offense level was 13, yielding a Guidelines range of 12 to 18 months imprisonment. The court sentenced Haggerty to the low end of the range, 12 months and one day in prison, followed by three years of supervised release. Haggerty filed a timely notice of appeal.

In his appeal, Haggerty raises two issues.

First, Haggerty argues that because 18 U.S.C. § 1152 does not extend to offenses committed by Indian defendants against Indian victims, the Indian/non-Indian statuses of both the defendant and victim are essential elements of any offense prosecuted under § 1152 and therefore must be proven by the Government. Because the Government did not put forth sufficient evidence proving that Haggerty is a non-Indian, he argues there is insufficient evidence supporting his conviction.[3]

Second, Haggerty argues the district court erred at sentencing by incorrectly applying U.S.S.G. § 2B1.5. He claims the court should have used the repair cost of $1,800 as the "value" of the statue for purposes of applying the enhancement, rather than its $92,000 purchase price.

---

[3] Neither side disputes that the victims in this case are Indian.

No. 20-50203

We take each issue in turn.

## II. Indian/non-Indian Status Under 18 U.S.C. § 1152

### A. Standard of Review

Both Haggerty and the Government agree that Haggerty has pre-served a general sufficiency-of-the-evidence challenge by pleading not guilty in advance of his bench trial, citing the rule first stated in *Hall v. United States*, 286 F.2d 676 (5th Cir. 1960). There, we held that when a defendant pleads not guilty *before a bench trial*, "[t]he plea of not guilty asks the court for a judgment of acquittal, and a motion to the same end is not necessary." *Id.* at 677; *accord United States v. Rosas-Fuentes*, 970 F.2d 1379, 1381 (5th Cir. 1992); *United States v. Vargas*, 673 F. App'x 393, 394 (5th Cir. 2016). The parties thus assert that Haggerty's sufficiency-of-the-evidence challenge re-lating to the purported lack of proof of his non-Indian status should be re-viewed de novo.

Regardless, however, of whether Haggerty has preserved a general sufficiency-of-the-evidence challenge, there are serious reasons to think that Haggerty has *not* preserved the underlying legal argument that a defendant's Indian or non-Indian status is an essential element of any offense prosecuted pursuant to § 1152. For one, this court's precedent strongly suggests that even when a defendant preserves a general challenge to the sufficiency of the evidence, he must still independently preserve the legal "subissue" of whether an offense contains an additional element that has yet to be recog-nized in this circuit. *See United States v. Brace*, 145 F.3d 247, 255-58, 258 n.2 (5th Cir. 1998) (en banc).[4]

---

[4] In *Brace*, the defendant filed a general motion for acquittal in the district court and argued on appeal that the government failed to prove that he was "predisposed" to commit money laundering, as was its burden to defeat his entrapment defense. *Brace*, 145

No. 20-50203

In addition, an indictment that fails to include all of the essential elements of the charged offense is defective and can be dismissed upon a defendant's motion for "failure to state an offense." FED. R. CRIM. P. 12(b)(3)(B)(v); *accord United States v. Qazi*, 975 F.3d 989, 993 (9th Cir. 2020) (citing 5 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 19.3(a)-(b) (4th ed. 2015)). Absent good cause, such a motion *must* be made before trial if the basis for the motion is reasonably available and can be determined without a trial on the merits. FED. R. CRIM. P. 12(b)(3), (4)(c)(3). Here, Haggerty moved before trial to dismiss the Government's indictment on the ground that § 1363 is unconstitutional. But he chose *not* to attack the indictment for failure to state an offense, even though it was silent as to Haggerty's Indian or non-Indian status, and even though Haggerty's argument that his non-Indian status is an essential element of the offense was both "reasonably available" and "can be determined without a trial on the merits."

Instead, Haggerty waited until his appeal—after jeopardy had attached, and after he successfully argued for and received acceptance of responsibility credit because he sought a bench trial to "preserve issues that do

---

F.3d at 255-58, 258 n.2. At issue was whether the defendant had preserved, solely via his general motion for acquittal, the legal argument that the government had to prove "positional" as well as "dispositional" predisposition. *Id.* Whether a defendant's "predisposition" to commit the crime, for purposes of defeating an entrapment defense, contained a "positional" element was an open question in this circuit, and the defendant in *Brace* never specifically articulated that "new" legal theory to the district court. *Id.* at 256. This court thus held that while "[the defendant's] sufficiency-of-the-evidence issue was preserved by his general motions for judgment of acquittal . . . *the factual and legal subissue* of whether [the defendant] was in the position to commit the crime . . . was never raised, and, hence not preserved." *Id.* at 258 n.2 (emphasis removed and added). Thus, the court in *Brace* reviewed the record, de novo, to determine if the government had presented sufficient evidence of the defendant's predisposition to commit money laundering, but only as that element was understood to exist "under existing relevant precedent." *Id.* at 261.

5

not relate to factual guilt"—to make that same underlying legal argument for the first time. Thus, even though Haggerty does not purport to attack the sufficiency of the indictment on appeal, there is a serious question as to whether his failure to assert his underlying legal argument that his non-Indian status is an essential element precludes him from repackaging that argument into a sufficiency-of-the-evidence challenge on appeal.

At bottom, we are skeptical that we can apply anything but plain error review to a legal argument that is being made for the first time on appeal, especially when Haggerty passed on an available opportunity to make that same argument to the district court. *See Montano v. Texas*, 867 F.3d 540, 546 (5th Cir. 2017) ("[A] court of appeals sits as a court of review, not of first view." (citation omitted)); *LeMaire v. La. Dept. of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007) ("[A]rguments not raised before the district court are waived and cannot be raised for the first time on appeal."). Nevertheless, we pretermit a full discussion of the appropriate standard of review because we conclude that Haggerty's argument about Indian/non-Indian status fails even under de novo review, for the reasons we now explain. *See United States v. Kieffer*, 991 F.3d 630, 635 & n.4 (5th Cir. 2021).

## B. Discussion

In relevant part, 18 U.S.C. § 1363 states that "[w]hoever, *within the special maritime and territorial jurisdiction of the United States*, willfully and maliciously destroys or injures any structure, conveyance, or other real or personal property" shall be liable. 18 U.S.C. § 1363 (emphasis added). Section 1363 is one of many "federal enclave laws" where, by definition, "the situs of the offense is an element of the crime," *United States v. Begay*, 42 F.3d 486, 498 (9th Cir. 1994). *See United States v. Markiewicz*, 978 F.2d 786, 797 (2d. Cir. 1992) (cataloging some of the various federal enclave laws, including § 1363). Thus, a defendant is liable under § 1363 when he (1)

No. 20-50203

willfully and maliciously destroys property (2) while located "within the special maritime and territorial jurisdiction of the United States." The former requirement is the "substantive element" of the offense, while the latter is the "jurisdictional element." *See Torres v. Lynch*, 136 S. Ct. 1619, 1624-25, 1630-33 (2016) ("[T]he substantive elements of a federal statute describe the evil Congress seeks to prevent; the jurisdictional element connects the law to one of Congress's enumerated powers, thus establishing legislative authority."); *see also United States v. Cowboy*, 694 F.2d 1228, 1234 (10th Cir. 1982) ("[F]ederal enclave laws . . . are criminal statutes enacted by Congress under its admiralty, maritime, and property powers, governing enclaves such as national parks."). "Both kinds of elements must be proved to [the factfinder] beyond a reasonable doubt." *Torres*, 136 S. Ct. at 1630.[5]

18 U.S.C. § 1152, known variously as the Indian Country Crimes Act or the General Crimes Act,[6] "extends federal enclave law to non-Indian

---

[5] Proving (or failing to prove) a "jurisdictional element" of a federal offense is distinct from a district court's subject-matter jurisdiction. *See In re Sealed Case*, 936 F.3d 582, 594-95 (D.C. Cir. 2019) (discussing the difference between jurisdictional elements and the subject-matter jurisdiction of federal district courts); *see also United States v. Reasor*, 418 F.3d 466, 469 (5th Cir. 2005) ("[A]n element can be jurisdictional in nature without affecting the jurisdiction of the court to adjudicate the case."). Rather, subject-matter jurisdiction is "straightforward in the criminal context." *United States v. Scruggs*, 714 F.3d 258, 262 (5th Cir. 2013). "[A]n indictment need only charge a defendant with an offense against the United States in language similar to that used by the relevant statute. That is the extent of the jurisdictional analysis . . . ." *Id.* (internal quotation marks and citation omitted); *see also Hugi v. United States*, 164 F.3d 378, 380 (7th Cir. 1999) ("Subject-matter jurisdiction in every federal criminal prosecution comes from 18 U.S.C. § 3231 . . . . That's the beginning and the end of the 'jurisdictional' inquiry. Lawyers and judges sometimes refer to the interstate-commerce element that appears in many federal crimes as the 'jurisdictional element,' but this is a colloquialism—or perhaps a demonstration that the word 'jurisdiction' has so many different uses that confusion ensues.").

[6] *See United States v. Prentiss*, 256 F.3d 971, 974 n.1 (10th Cir. 2001) (en banc); Felix Cohen, Cohen's Handbook of Federal Indian Law § 9.02, LEXIS (updated June 2019).

No. 20-50203

offenses on Indian reservations." *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 208 (1978), *superseded by statute on other grounds as recognized in United States v. Lara*, 541 U.S. 193, 205-07 (2004). Section 1152 states in full:

> Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place *within the sole and exclusive jurisdiction of the United States*, except the District of Columbia, *shall extend to the Indian country.*
>
> This section *shall not extend* to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.

18 U.S.C. § 1152 (emphasis added).

In its first clause, § 1152 extends the jurisdictional situs element of federal enclave laws to encompass Indian country. But, in its second clause, it carves out three scenarios that would otherwise fall under the umbrella of the first clause. Section 1152 "shall not extend" to (1) offenses committed by an Indian defendant against an Indian victim (i.e., "intra-Indian" offenses); (2) offenses committed by an Indian who has already been punished by the local law of the tribe; and (3) cases where exclusive jurisdiction is secured to an Indian tribe via treaty. *Id.* [7]

---

[7] In an 1881 decision, the Supreme Court held that state courts have exclusive jurisdiction over the prosecution of crimes committed within Indian country by a non-Indian defendant against a non-Indian victim. *United States v. McBratney*, 104 U.S. 621, 621-24 (1881); *accord New York ex rel. Ray v. Martin*, 326 U.S. 496, 497-99 (1946) (affirming and applying *McBratney*). The *McBratney* rule is a "judicially-created exception" that did not turn on the language of § 1152 or its predecessor statutes or treaties; instead, the Court relied "on the inherent jurisdiction exercised by states over Indian lands within their

No. 20-50203

The question presented here—an issue of first impression in this circuit—is, when the victim *is* Indian (both charged and also proven), whether the intra-Indian carve-out in § 1152 operates to make the non-Indian status of the defendant an "essential element" of any offense prosecuted via § 1152, or whether the defendant's Indian status is instead an affirmative defense that must be asserted as a defense to prosecution.[8]

A circuit split exists on this issue. In *United States v. Hester*, the Ninth Circuit concluded that a defendant's Indian/non-Indian status is *not* an essential element of an offense prosecuted via § 1152. 719 F.2d 1041, 1043 (9th Cir. 1983). Several years later, a divided en banc panel of the Tenth Circuit reached the opposite conclusion. *United States v. Prentiss*, 256 F.3d 971, 980 (10th Cir. 2001) (en banc), *overruled on other grounds as recognized in United States v. Sinks*, 473 F.3d 1315, 1317 (10th Cir. 2007).[9]

---

borders as a consequence of their admission to the Union without an express disclaimer of jurisdiction." Robert N. Clinton, *Criminal Jurisdiction Over Indian Lands: A Journey Through a Jurisdictional Maze*, 18 ARIZ. L. REV. 503, 524-25 (1976). As a practical matter, the *McBratney* rule combined with the intra-Indian exception of § 1152 will often determine which sovereign (federal, state, or tribal) may prosecute criminal offenses occurring in Indian country, turning on the respective Indian/non-Indian statuses of the defendant and victim. *See United States v. Bruce*, 394 F.3d 1215, 1218-22 (9th Cir. 2005) (providing an overview of criminal jurisdiction in Indian country). But while the *McBratney* rule may have the effect of limiting the practical scope of § 1152 (the text of which does not foreclose the federal prosecution of purely non-Indian offenses in Indian country), it does not bear on our interpretation of the text of § 1152 as a matter of statutory construction.

[8] As will be explained below, an argument can be made that the nature of a *victim's* Indian/non-Indian status under § 1152 should be treated the same as the defendant's status as a matter of statutory construction. But because only the defendant's status is at issue here, we do not examine whether there are reasons that might lead to treating defendant and victim status differently.

[9] While *Hester* only considered whether a *defendant's* non-Indian status was an essential element, 719 F.2d at 1042-43, *Prentiss* primarily focused on the nature of a *victim's* Indian/non-Indian status (concluding both are essential elements), 256 F.3d at 975-76. Notably again, however, in both cases the issue was presented as a challenge to the

No. 20-50203

The key practical difference created by the split concerns who must raise and prove, and with what convincing force, the issue of Indian/non-Indian status. The Ninth Circuit reasoned that, when the victim is Indian, a defendant's Indian status is an affirmative defense for which the defendant bears the burden of pleading and production. *See Hester*, 719 F.2d at 1043. Under that view, the Government need not allege the defendant's non-Indian status, *id.*, but should the defendant "properly raise[] the issue of his Indian status," the court in *Hester* recognized that "the ultimate burden of proof remains, of course, upon the Government." *Id.* By contrast, the Tenth Circuit held that the entire burden is on the Government: it must allege the defendant's (and victim's) Indian/non-Indian status and bear the burden of production and persuasion at trial. *Prentiss*, 256 F.3d at 975, 980.[10]

We agree with both circuits in that, either way, the Government retains the ultimate burden of persuasion because a defendant's Indian/non-Indian status, via the operation of § 1152, affects the applicable scope of the relevant federal enclave law's jurisdictional situs element. *See Smith v. United States*, 568 U.S. 106, 110-11 (2013); *Torres*, 136 S. Ct. at 1630. But to determine whether Indian status is an affirmative defense that must first be

_____

sufficiency of the indictment, not the sufficiency of the evidence presented at trial. *Hester*, 719 F.2d at 1042; *Prentiss*, 256 F.3d at 973.

[10] As the Tenth Circuit explains:

> An affirmative defense may impose various burdens on the defendant: (1) the burden of pleading ("the burden of introducing [a] defense for consideration"), Paul H. Robinson, 1 *Criminal Law Defenses* § 3(a), at 12 (1984); (2) the burden of production (the burden of "adduc [ing] sufficient evidence to . . . support . . . the presence of [a] defense"), *id.* § 3(b), at 15; or (3) the burden of persuasion (the burden of "convinc [ing] the tribunal of the existence of the facts" supporting the defense). *Id.* § 5(a), at 41.

*Prentiss*, 256 F.3d at 975 n.2 (alterations in original).

raised by a defendant—i.e., the defendant bears the burden of pleading and production—we begin by considering the text of § 1152 and principles of statutory construction. *See United States v. Steele*, 147 F.3d 1316, 1320 (11th Cir. 1998) (describing that Congress "defines crimes and defenses in the United States Code" and that, subject to constitutional constraints, "it has the authority to specify whether a given factor must be pleaded by the government in the indictment as an element of an offense, or affirmatively raised by the defense as part of its case").

It is a "well-established rule of criminal statutory construction that an exception set forth in a distinct clause or provision should be construed as an affirmative defense and not as an essential element of the crime." *United States v. Santos-Riviera*, 183 F.3d 367, 370-71 (5th Cir. 1999). The Supreme Court articulated this rule in *McKelvey v. United States*, where it stated:

> By repeated decisions it has come to be a settled rule in this jurisdiction that an indictment or other pleading founded on a general provision defining the elements of an offense, or of a right conferred, need not negative the matter of an exception made by a proviso or other distinct clause, whether in the same section or elsewhere, and that it is incumbent on one who relies on such an exception to set it up and establish it.

260 U.S. 353, 357 (1922).

Section 1152 appears to be the exact type of statute contemplated by the Supreme Court. It has two distinct clauses, the first of which generally extends the scope of all federal enclave laws to include Indian country. The second clause, set out from the first, describes three exceptions to the general definition set forth in the first clause.

To counter the applicability of the *McKelvey* rule to § 1152, Haggerty draws attention to older precedent and a separate principle relating to exceptions in criminal statutes. In *United States v. Cook*, the Supreme Court

described that "[w]here a statute defining an offence contains an exception . . . which is so incorporated with the language defining the offence that the ingredients of the offence cannot be accurately and clearly described if the exception is omitted" then an indictment must allege that "the accused is not within the exception." 84 U.S. (17 Wall.) 168, 173-74 (1872). Citing *Cook*, Haggerty argues that if we omit the intra-Indian exception the elements of § 1152 cannot be "accurately and clearly described."

But Haggerty's argument only works if its conclusion is also its premise: that because the intra-Indian exception is an essential element of the offense, the offense cannot be described if the exception is omitted. Such reasoning is circular. *See Prentiss*, 256 F.3d at 988 (Baldock, J., dissenting) ("The [majority] claims that 'the ingredients of the offence cannot be accurately and clearly described if the [interracial] exception is omitted.' But that simply begs the question of what 'ingredients' constitute the offense." (alteration in original)). By contrast, here is one way to describe Haggerty's crime of conviction under § 1152 and § 1363 without mentioning the intra-Indian exception: "Whoever maliciously destroys property in Indian country is guilty of an offense." There is nothing inaccurate or unclear about that description, as it would be within Congress's authority to define such an offense without providing an intra-Indian exception. *See, e.g.*, 18 U.S.C. § 1153(a) (expressly permitting the federal prosecution of certain intra-Indian offenses in Indian country). *Cook* thus is not determinative. *See United States v. McArthur*, 108 F.3d 1350, 1353 (11th Cir. 1997) ("[W]here one can omit the exception from the statute without doing violence to the definition of the offense, the exception is more likely an affirmative defense.").[11]

---

[11] The *McKelvey* rule may have practical force in the instant circumstance where, as noted by the court in *Hester*, it "is far more manageable for the defendant to shoulder the burden of producing evidence that he is a member of a federally recognized tribe than

Importantly, Haggerty has not convincingly explained why we could treat the intra-Indian exception as an essential element, but not the other two exceptions contained in the second clause of § 1152. In our view, the three exceptions must be treated similarly. If, as Haggerty claims, the exceptions are essential elements, then the Government must also allege and affirmatively prove—every time it prosecutes a crime under § 1152—that the defendant has not already been punished by the local law of the tribe and that there is no treaty stipulation that grants exclusive jurisdiction to the respective tribe.

While the *McKelvey* rule requires that we treat the intra-Indian exception as exactly that—an exception—Haggerty argues that we are foreclosed from doing so by other Supreme Court precedent. Haggerty focuses on two nineteenth-century cases involving prosecutions under a predecessor statute to § 1152[12] (which also contained the intra-Indian exception): *United States v. Lucas*, 163 U.S. 612 (1896) and *Smith v. United States*, 151 U.S. 50 (1894). In both cases, however, there was no dispute that the defendant *was* Indian. It was the victim's status as a non-Indian that was at issue. Although we confront the opposite scenario here (where the defendant's status is being disputed on appeal), we agree with Haggerty insofar as the two scenarios appear to be corollaries as a matter of pure statutory construction. In other words, if the Supreme Court had held—as a matter of statutory interpretation—that *victim* Indian/non-Indian status is an essential element under § 1152, that would strongly imply that *defendant*

---

it is for the Government to produce evidence that he is not a member of any one of the hundreds of such tribes," 719 F.2d at 1043.

[12] For a discussion of the statutes and treaties preceding § 1152, see *Prentiss*, 256 F.3d at 985 n.13 (Baldock, J., dissenting).

Indian/non-Indian status is also an essential element. However, we disagree that the Supreme Court held as much in either case.

*Lucas* concerned the prosecution of an Indian defendant for an alleged murder committed in Indian country. 163 U.S. at 614-15. The Government had alleged in the indictment that the victim "was a negro, and not an Indian" and then proceeded at trial to introduce evidence that the victim was not a tribal member. *Id.* at 616-17. The defense objected to the evidence purporting to show the victim's non-Indian status. *Id.* at 617. Despite the introduction of such disputed evidence, the district court instructed the jury that there was a legal presumption that the victim was non-Indian given the concession that he was "a negro." *Id.* at 615. The Court concluded this presumption and instruction were error, and explained that "[t]he burden of proof was on the government to sustain the jurisdiction of the court by evidence as to the status of the deceased [i.e., the victim], and the question should have gone to the jury as one of fact, and not of presumption." *Id.* at 617-18; *see also id.* at 615 ("[T]he averment in the indictment in the present case that [the victim] was a negro, and not an Indian, was the averment of a jurisdictional fact, which it was necessary for the prosecution to sustain by competent evidence."). [13]

---

[13] That the court in *Lucas* tied the victim's non-Indian status to sustaining "the jurisdiction of the court" does not mean the question presented here is one of subject-matter jurisdiction. *See supra* note 5. In more recent history, the Supreme Court has made an effort to discipline the use of jurisdictional language, such that we are reluctant to draw any wide-sweeping conclusions from the Court's use of jurisdictional language over a century ago, especially in the face of contrary modern doctrine. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 510 (2006) ("Jurisdiction . . . is a word of many, too many, meanings. This Court, no less than other courts, has sometimes been profligate in its use of the term." (internal quotation marks and citation omitted)); *see also United States v. Cotton*, 535 U.S. 625, 629-32 (2002) (discussing the historical understanding of criminal subject-matter jurisdiction in relation to present-day doctrine).

As explained above, we agree that the Government retains the ultimate burden of proof when the intra-Indian exception is at issue. Were there any doubt on this front, *Lucas* would help resolve it. But *Lucas* does not resolve the question of which party bears the *initial* burdens of pleading and production on the intra-Indian exception. It is true that the Government alleged that the victim was non-Indian and introduced evidence on the subject. But *Lucas* is silent as to whether the Government was *required* to do so; all we know is that the Government raised the issue and the defense contested it, creating a fact dispute as to the applicability of the exception. In short, nothing in *Lucas* is inconsistent with our decision to treat the intra-Indian exception as an affirmative defense that must be asserted by the defendant, with the Government retaining the ultimate burden of proof.

The same is true of *Smith*. *Smith* also concerned the prosecution of an Indian defendant for the alleged murder of a victim whom, in another similarity to *Lucas*, the Government alleged in the indictment to be "a white man, and not an Indian." *Id.* at 50, 53-55. At trial, the *defense* called multiple witnesses in an effort to prove that the victim, like the defendant, was Indian. *Id.* at 54. The Supreme Court reversed the defendant's conviction, concluding that the Government had offered no relevant evidence tending to prove the victim's non-Indian status responsive to contrary evidence presented by the defense. *Id.* at 55-56. The Court wrote: "That [the victim] was a white man, and not an Indian, was a fact which the government was bound to establish, and, if it failed to introduce any evidence upon that point, defendant was entitled to an instruction to that effect." *Id.* at 55. As with *Lucas*, the Supreme Court described that the ultimate burden of proof with respect to the victim's non-Indian status remained with the Government. But, again like *Lucas*, the Court in *Smith* did not describe which party had the initial burden to raise the issue of the victim's Indian/non-Indian status.

In sum, with respect to crimes prosecuted via § 1152, settled and reconcilable Supreme Court doctrine, as well as principles of statutory construction, demonstrate that, when the victim is Indian, the defendant's status as Indian is an affirmative defense for which the defendant bears the burden of pleading and production, with the ultimate burden of proof remaining with the Government. Therefore, because Haggerty did not raise the issue of Indian status at trial as an affirmative defense, the Government met its burden to prove the jurisdictional element of § 1363 (as extended by § 1152) by introducing evidence sufficient to establish that the offense occurred in Indian country.

### III. THE "VALUE" OF A CULTURAL HERITAGE RESOURCE UNDER U.S.S.G. § 2B1.5

#### A. Standard of Review

Haggerty did object at sentencing to the district court's application of U.S.S.G. § 2B1.5. Therefore, we review the district court's application of the Guidelines de novo, and review findings of fact for clear error. *United States v. Valdez*, 726 F.3d 684, 692 (5th Cir. 2013). "There is no clear error if the district court's finding is plausible in light of the record as a whole." *Id.* (citation omitted).

#### B. Discussion

U.S.S.G. § 2B1.1 is the applicable guideline for Haggerty's conviction under 18 U.S.C. § 1363. U.S.S.G. § 2B1.1 cmt. statutory provisions (2018). Section 2B1.1(c)(4) instructs the district court to cross reference and apply § 2B1.5 "[i]f the offense involved a cultural heritage resource." Both parties agree § 2B1.5 is the applicable Guideline and that the damaged statue is the relevant cultural resource.

Section 2B1.5 applies to the "theft of, damage to, or destruction of, cultural heritage resources." It provides a base offense level of 8 and instructs that the offense level should be increased "[i]f the *value* of the cultural heritage resource" exceeds certain threshold amounts set forth in the table contained in § 2B1.1(b)(1). U.S.S.G. §§ 2B1.5(a)-(b)(1) (2018) (emphasis added).

The "value of the resource" is defined in Application Note 2(A), which states:

> **Value of the Resource Under Subsection (b)(1).**—This application note applies to the determination of the value of the resource under subsection (b)(1).
>
> **(A) General Rule.**—For purposes of subsection (b)(1), the value of the resource shall include, as applicable to the particular resource involved, the following:
>
>> (i) The archaeological value. (Archaeological value shall be included in the case of any resource that is an archaeological resource.)
>>
>> (ii) The commercial value.
>>
>> (iii) The cost of restoration and repair.

U.S.S.G. § 2B1.5 cmt. n.2.

The terms "archaeological value," "commercial value," and "cost of restoration and repair" are defined in Application Note 2(C). There is no dispute that "archaeological value" is irrelevant here, or that the definition of "cost of restoration and repair" would include the $1,800 repair cost to the statue. Nor that the definition of "commercial value" is "the fair market value of the resource at the time of the offense." U.S.S.G. § 2B1.5 cmt. n.2(C)(ii). Additionally, Application Note 2(B) states that "[f]or purposes of subsection (b)(1), the court need only make a reasonable estimate of the value

of the resource based on available information." U.S.S.G § 2B1.5 cmt. n.2(B).

Here, the probation officer who completed the Presentence Investigation Report ("PSR") calculated the value of the statue,  for purposes of applying § 2B1.5, based on its "commercial value," which she calculated to be the $92,000 purchase price of the statue. The district court adopted the PSR without change.

Haggerty argues the district court made two errors in applying § 2B1.5. First, without further elaboration, he argues that the statue's $92,000 "purchase price" is not evidence of its "commercial value" for purposes of § 2B1.5. Second, assuming *arguendo* that the commercial value of the statue totals $92,000, he argues that "[a]s a matter of law, where—as here—a non-archaeological 'resource' is restored to its prior physical condition, it is error to use the total value of that resource in calculating the offense level under USSG § 2B1.5; rather, the court should use the cost of restoration incurred in bringing the resource back to its prior condition."

Haggerty's first argument plainly fails. The PSR describes that the tribe purchased the statue on December 2, 2016, roughly ten months before the offense. There is no indication that the tribe received a below-market price. Thus, on the information available to it, the district court did not commit clear error in concluding that the statue's "purchase price" provides a reasonable estimate of its "fair market value" at the time of the offense (i.e., its "commercial value").

With respect to his second argument, Haggerty cites no law in support of his asserted principle that the restoration cost should control.[14]

---

[14] In fairness, there appears to be little case law interpreting § 2B1.5.

No. 20-50203

Regardless, his argument is unsupported by the text. The Guidelines state only that the "value" of the cultural heritage resource "shall include, as applicable," the three different valuations. U.S.S.G. § 2B1.5 cmt. n.2(A). There is nothing that suggests that "the cost of restoration or repair" takes precedence over and obviates the other two valuations.

While the text of § 2B1.5 forecloses Haggerty's argument, we also note that the Sentencing Commission's explanation for why it promulgated § 2B1.5 further cuts against Haggerty's view. *See generally* U.S.S.G. supp. to app. C, amend. 638 at 245, 253-56 (Nov. 1, 2002).[15] Notably, the Commission makes it clear that the harm that it is concerned about when it comes to the damage and destruction of cultural heritage resources is not purely (or even primarily) the resource's physical condition or monetary value. Rather, the purpose of § 2B1.5 is to provide "flexibility" to appropriately *punish* offenders for both the tangible and *intangible* harm caused by their damage of cultural heritage resources. *See id.* at 253-54. As the Commission explains:

> This amendment reflects the Commission's conclusion that the existing sentencing guidelines for economic and property destruction crimes are inadequate to punish in an appropriate and proportional way the variety of federal crimes involving the theft of, damage to, destruction of, or illicit trafficking in, cultural heritage resources. . . .
>
> . . . Because individuals, communities, and nations identify themselves through intellectual, emotional, and spiritual connections to places and objects, the effects of cultural heritage resource crimes transcend mere monetary considerations. Accordingly, this new guideline takes into account the transcendent and irreplaceable value of cultural heritage resources and punishes in a proportionate way the

---

[15]Accessible at: https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/2002/manual/APPCSUPP.pdf.

19

aggravating conduct associated with cultural heritage resource crimes.

. . .

The new guideline also provides that the monetary value of the cultural heritage resource is an important, although not the sole, factor in determining the appropriate punishment. The Commission has elected not to use the concept of "loss," which is an integral part of the theft, fraud, and property destruction guideline at §2B1.1, because cultural heritage offenses do not involve the same fungible and compensatory values embodied in "loss." Instead, under this new guideline, value is to be based on commercial value, archaeological value, *and* the cost of restoration and repair.

*Id.* (emphasis added).

In short, Haggerty's second argument would have us rewrite the text of § 2B1.5 in tension with the purpose behind its promulgation.

## IV. Conclusion

Haggerty's conviction and sentence are AFFIRMED.

No. 20-50203

ANDREW S. OLDHAM, *Circuit Judge*, concurring in the judgment:

I agree that Haggerty's conviction must be affirmed. But I respectfully disagree with the majority's refusal to review his sufficiency-of-the-evidence claim for plain error. *See ante*, at 4–6. Binding en banc precedent holds that raising sufficiency issues is not enough to preserve unraised "factual and legal subissue[s]" like the one Haggerty wants to litigate. *United States v. Brace*, 145 F.3d 247, 258 n.2 (5th Cir. 1998) (en banc). I do not understand how we can dismiss an on-point en banc decision as a mere "suggest[ion]." *Compare ante*, at 4–5, *with Gahagan v. U.S. Citizenship & Immigr. Servs.*, 911 F.3d 298, 302 (5th Cir. 2018) ("Three-judge panels abide by a prior Fifth Circuit decision until the decision is overruled . . . by the Fifth Circuit sitting en banc." (quotation omitted)). Obviously future panels will be bound by *Brace*, even if ours is not.

In the majority's defense, this is not the first time we've sown confusion in this area. I write separately to explain how error preservation is supposed to work. And how badly we've misinterpreted the rules over the last 60 years.

I.

Let's start with how error preservation is supposed to work. It's axiomatic that "a right may be forfeited in criminal . . . cases by the failure to . . . timely assert[]" it. *Puckett v. United States*, 556 U.S. 129, 134 (2009) (quotation omitted). It's also well established that the only way to timely assert a right in a federal criminal case is to comply with Federal Rule of Criminal Procedure 51(b). *See id.* at 135. That Rule provides:

> A party may preserve a claim of error by informing the court— when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection.

Thus, a criminal defendant like Haggerty can preserve a claim of error in two (and only two) ways. First, he can inform the court "of the action [he] wishes the court to take" at the time he seeks a ruling. Second, he can inform the court of his "objection to the court's action and the grounds for that objection" at the time a ruling is made. Those are the options. And whichever option a defendant chooses, his requested action or grounds for objection must be specific. *See Puckett*, 556 U.S. at 134 (explaining that an objector must "give[] the district court the opportunity to consider and resolve" his objections); *United States v. Kieffer*, 991 F.3d 630, 638 (5th Cir. 2021) (Oldham, J., concurring in the judgment) ("In general, the litigant attempting to preserve an error must focus the decisionmaker's mind on the specific legal problem, so the error (if there is one) can be corrected."). Failure to comply with these constraints "precludes the raising on appeal of the unpreserved claim" unless the "limited exception" of plain-error review applies. *Puckett*, 556 U.S. at 135; FED. R. CRIM. P. 52(b).

Federal Rule of Criminal Procedure 29 applies this framework to sufficiency-of-the-evidence challenges. The Rule permits a defendant to file a "motion [for] . . . a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29(a). A defendant can file such a motion as soon as "the government closes its evidence" at trial or as late as "14 days after a guilty verdict or after the court discharges the jury." *Id.* 29(a), (c)(1). But in keeping with Rule 51, a defendant who fails to file a Rule 29 motion cannot get de novo review of sufficiency issues on appeal. *See United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007). Nor can a defendant get de novo review by filing a Rule 29 motion that fails to "specify . . . the particular [evidentiary] basis on which

acquittal is sought." *Ibid.*; *accord United States v. Herrera*, 313 F.3d 882, 884 (5th Cir. 2002) (en banc) (per curiam).[1]

## II.

Given all this, you might wonder how someone like Haggerty—who concedes he "did not move for acquittal for insufficient evidence" at trial, Blue Br. 8—could possibly get *de novo* review of a sufficiency claim on appeal. The answer lies in a case we decided 60 years ago and that has no basis in the Rules.

## A.

That case is *Hall v. United States*, 286 F.2d 676 (5th Cir. 1960). The defendant in *Hall* appealed his federal conviction for bank fraud on the sole ground of insufficient evidence. *Id.* at 677–78. But he hadn't said anything about sufficiency to the trial court. So the Government sensibly asked our court to review the conviction for plain error. *See id.* at 677.

We refused. After quoting precedent that unequivocally held the failure to raise a sufficiency challenge required plain-error review, *see ibid.* (quoting *Demos v. United States*, 205 F.2d 596, 599 (5th Cir. 1953)), we confined that rule to cases involving jury trials. We then held that in bench trial cases, pleading not guilty automatically preserves all sufficiency issues for appeal. Here is the entirety of our reasoning:

> [T]here can be little or no need for a formal motion for a judgment of acquittal in a criminal case tried to a court without a jury upon the defendant's plea of not guilty. The plea of not guilty asks the court for a judgment of acquittal, and a motion to the same end is not necessary. In such a case, therefore, we

---

[1] For a discussion of a "disturbing countertrend in our precedent," see *Kieffer*, 991 F.3d at 637–41 (Oldham, J., concurring in the judgment).

No. 20-50203

hold that the sufficiency of the evidence to sustain a conviction should be reviewed the same as if there had been a formal motion for judgment of acquittal.

*Ibid.* (citation omitted).

*Hall*'s theory has gained some purchase. A leading treatise calls it "sound." *See* 2A Charles Alan Wright & Peter J. Henning, Federal Practice and Procedure § 469, at 391 (4th ed. 2009). Several of our sister circuits have adopted it. *See, e.g.*, *United States v. Grace*, 367 F.3d 29, 34 (1st Cir. 2004) (joining the Sixth, Seventh, Ninth, and D.C. Circuits in holding that " a defendant does not have to make a Rule 29 motion in a bench trial to preserve the usual standard of review for a sufficiency of the evidence claim on appeal"). And our court continues to apply it. *See ante*, at 4; *United States v. Rosas-Fuentes*, 970 F.2d 1379, 1381 (5th Cir. 1992).

B.

We should stop. There are four reasons why.

First, *Hall* ignores the text of Rule 51.[2] The Supreme Court has made clear that Rule 51 is *the* mechanism for error preservation in a federal criminal case. *See Puckett*, 556 U.S. at 135 ("In federal criminal cases, Rule 51(b) tells parties how to preserve claims of error . . . ."). And the preservation mechanism in *Hall* looks nothing like the procedure spelled out in Rule 51. Pleading not guilty obviously doesn't qualify as an "objection to the court's action" or provide "grounds for that objection." Fed. R. Crim. P. 51(b). It is instead an objection to having to stand trial. Nor does pleading not guilty

---

[2] Much like it does today, the version of Rule 51 in force when we decided *Hall* directed a defendant to "make[] known to the court the action which he desires the court to take or his objection to the action of the court and the grounds therefor" at "the time the ruling or order of the court is made or sought." Fed. R. Crim. P. 51, 327 U.S. 871, 871–72 (1945).

qualify as informing the court of an "action the [defendant] wishes the court to take" with the requisite degree of specificity. *Ibid.* Even our most lenient post-*Hall* preservation precedents recognize that "not guilty!" falls woefully short of what a defendant must say to get de novo review. *See, e.g.*, *United States v. Staggers*, 961 F.3d 745, 754 (5th Cir. 2020) (holding a defendant must at least "make[] a general *sufficiency-of-the-evidence* challenge" at trial to obtain de novo sufficiency review on appeal (emphasis added) (quotation omitted)). If it were otherwise, plain-error sufficiency review would completely disappear. *Contra United States v. Delgado*, 672 F.3d 320, 330 (5th Cir. 2012) (en banc) ("The four-prong [plain-error] analysis is applicable to all forfeited claims of error . . . , including [a] claim that the evidence [is] insufficient to support [a] . . . conviction.").

Second, *Hall* ignores the foundational preservation principles that underlie Rule 51. A central reason for the contemporaneous-objection requirement is that it "gives the district court the opportunity to consider and resolve" a defendant's objections as they arise. *Puckett*, 556 U.S. at 134. That is possible when a defendant timely raises sufficiency concerns about evidence that has already been admitted at trial. *See* FED. R. CRIM. P. 29(a) (authorizing sufficiency motions "[a]fter the government closes its evidence"). But it is obviously impossible when a defendant like Haggerty says "not guilty!" *months before the Government has offered any evidence at all.* How is a district court supposed to resolve a not-guilty "objection" before the Government has called its first witness?[3]

---

[3] *Hall*'s plead-and-preserve theory is even more absurd when applied to a defendant who asks the court to conduct a trial on stipulated facts. *See ante*, at 2–3. Haggerty's strategy from the very beginning was to concede the facts and dispute the law. He even got credit for accepting responsibility, *id.* at 6—a sentencing adjustment that "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt," U.S.S.G. § 3E1.1 cmt. n.2. Such

No. 20-50203

And why would a defendant lodge a proper objection under Rule 51 when a simple not-guilty plea suffices? In fact, why even bother to plead at all? The Federal Rules say that "[i]f a defendant refuses to enter a plea[,] . . . the court must enter a plea of not guilty." FED. R. CRIM. P. 11(a)(4). So according to *Hall*, a defendant can do absolutely nothing and still get de novo sufficiency review on appeal. That is the opposite of how error preservation is supposed to work. *See Puckett*, 556 U.S. at 134 ("[T]he contemporaneous-objection rule prevents a litigant from sandbagging the court [by] remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor." (quotation omitted)); *accord Kieffer*, 991 F.3d at 638 (Oldham, J., concurring in the judgment).

Third, *Hall* creates a distinction between sufficiency problems and other constitutional infirmities that doesn't make sense. The upshot of *Hall* is that defendants have a much easier time preserving sufficiency arguments than they do preserving anything else: ask for a bench trial, plead not guilty, and you're set. *Hall* attempts to justify this distinction by pointing to the constitutional "duty of the trial court to direct a verdict of acquittal, regardless of whether a motion to that effect is made." 286 F.2d at 677 (quotation omitted); *see also Grace*, 367 F.3d at 34 (agreeing with *Hall* because "[t]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt" (quotation omitted)). But the Supreme Court has "repeatedly cautioned" against tinkering with the "careful balance" effected by Rule 51's preservation requirements and Rule 52's plain-error exception on a right-by-right basis. *See Puckett*, 556 U.S. at

---

calculated decision-making is certainly grounds for forfeiture and probably grounds for waiver. *See United States v. Olano*, 507 U.S. 725, 733 (1993) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." (quotation omitted)).

135–36. Moreover, we have refused to elevate a defendant's due process right to sufficient proof above other constitutional rights in related contexts. *See, e.g.*, *Delgado*, 672 F.3d at 331 (observing that "the Constitution does not require that the sufficiency of the evidence be subject to *de novo* review in all cases" and that the Supreme Court's plain-error cases "do not . . . allow[] for any exceptions to the application of the plain-error test for forfeited [sufficiency] claims"); *Parr v. Quarterman*, 472 F.3d 245, 252–53 (5th Cir. 2006) (affirming the district court's holding that a sufficiency argument was procedurally barred because the habeas applicant "did not present th[is] claim[] to the state court on direct appeal or in state habeas proceedings").

Fourth, and finally, *Hall* introduces a distinction between jury trials and bench trials that doesn't make sense. The theory appears to be that in a bench trial where the court is the factfinder, pleading not guilty and then filing a motion under Rule 29 essentially asks the court to repeat the same exercise twice. *See Hall*, 286 F.2d at 677 ("The plea of not guilty asks the court for a judgment of acquittal, and a motion to the same end is not necessary."). But that reasoning doesn't hold up.

For one thing, the premise is wrong. Even in bench trials, not-guilty pleas and Rule 29 motions serve different functions and require courts to perform different tasks. "A plea of not guilty puts all material elements of the crime charged in play, even the most obvious facts." 1A Charles Alan Wright & Andrew D. Leipold, Federal Practice and Procedure § 173, at 177 (4th ed. 2008). A court that receives such a plea must therefore hold the Government to its burden of proof by conducting a trial. *See id.* at 177 n.5. By contrast, a Rule 29 motion "challenge[s] the sufficiency of the evidence" *after* it is offered at trial. Wright & Henning, *supra*, § 466, at 355. A court that receives such a motion must therefore review the evidence and "enter . . . judgment" if the Government has failed to make the necessary showing. *Id.* § 461, at 320. Entering

judgment on sufficiency grounds is obviously not an option until after the Government has presented its case. *See supra* at 5. So it makes no sense to say that a pre-evidence plea can double as a post-evidence acquittal motion. The plea informs the court that the defendant wants a trial because he hopes the evidence will emerge in his favor; the motion informs the court that the defendant wants a judgment because he thinks the evidence has borne out his plea. *Cf. United States v. Johnson*, 741 F. App'x 233, 234 (5th Cir. 2018) (per curiam) (describing a defendant's decision to plead guilty in light of trial evidence that undermined his defense).

But even if *Hall* is right about the redundancy of pleading not guilty and moving for acquittal in a bench trial, treating jury trials differently is still problematic. First, not-guilty pleas operate the same way in bench trials as they do in jury trials. *See* WRIGHT & HENNING, *supra*, § 469, at 391. So if "[t]he plea of not guilty asks the court for a judgment of acquittal" in one, *Hall*, 286 F.2d at 677, it also asks the court for a judgment of acquittal in the other. Second, Rule 51 doesn't differentiate between bench trials and jury trials. *See* FED. R. CRIM. P. 51(b). So our preservation standards shouldn't either. *See Puckett*, 556 U.S. at 135. And third, relaxing the standard for bench trials diminishes the value of a defendant's right to trial by jury. This right is a "fundamental reservation of power in our constitutional structure" that "is meant to ensure [the People's] control in the judiciary." *Blakely v. Washington*, 542 U.S. 296, 305–06 (2004). That is why courts' sufficiency-of-the-evidence review is so deferential. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (explaining that the sufficiency standard "impinges upon jury discretion only to the extent necessary to guarantee the fundamental protection of due process of law" (quotation omitted)). Yet *Hall* incentivizes defendants to surrender the jury-trial right for the automatic promise of de novo sufficiency review on appeal from a bench trial.

No. 20-50203

\*   \*   \*

I would apply Rule 51 as written and review Haggerty's forfeited sufficiency claim for plain error. *Hall*'s command to the contrary violates Supreme Court precedent and common sense. Today's treatment of the standard of review only further confuses a deeply confused doctrine.